Cassandra Johnson WEDGEWORTH,
Plaintiff,

v.

Charles HARRIS, The City of Madison and Unknown Officers, Agents and Employees of the City of Madison, Defendants.

No. 83–C–76–2–S.

United States District Court,
W.D. Wisconsin.

April 19, 1984.

M.A. Satterthwaite, Madison, Wis., for plaintiff.

Eugene O. Gehl, Madison, Wis., for defendant City of Madison.

John Moore, Madison, Wis., for defendant Harris.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Before the Court are separate motions for summary judgment on behalf of, respectively, defendant Charles Harris and the City of Madison, along with unnamed officers, agents and employees of the City. Plaintiff brought this action against the defendants, pursuant to 42 U.S.C. § 1983, for an alleged deprivation of constitutional rights. The questions presented by the motions are, first, whether a sexual assault by an on-duty police officer constitutes a violation of constitutional rights, and second, whether, under the facts of this case, the officer's employer, the City, and its supervisory law enforcement personnel, can be held liable for the violation.

### FACTS

The plaintiff, Cassandra Johnson Wedgeworth, is a female, adult resident of Arizona. During the early morning hours of July 18, 1982, while in Madison visiting her family, she alleges that she was sexually assaulted by defendant Charles Harris, an on-duty police officer for the City. The precise details of the assault need not be detailed here except to note that plaintiff was allegedly threatened with prosecution if she did not consent to sexual intercourse with Harris, and that she allegedly feared for her personal safety if she refused his advances. Harris was convicted in State court for sexual assault and is now serving a sentence in a Wisconsin correctional facility.

Harris' employment history, as submitted by the plaintiff and the City, appears as follows: [1]

Officer Harris was hired by the City of Madison Police Department in August, 1975, after a reasonably thorough background check. Interviews were conducted with prior employers and neighbors. Aside from an apparent habit of abusing sick leave, his prior employment history was uneventful. His record includes two traffic citations. Also, the record disclosed that Harris had been accused of battery on two occasions but the cases were not prosecuted because of lack of witnesses. The complainants did not sign the complaints. The latest of these complaints was on September 6, 1973.

He held the rank of Police Officer throughout his tenure on the Department and was assigned to the Patrol Division until July 2, 1982, shortly before the incident involving the plaintiff. At that time, he was assigned to the Neighborhood Response Unit.

Periodic performance evaluations were prepared by superiors. From the beginning, these reports noted the need to improve knowledge of policy, statutes and ordinances. In 1979, the reports noted that he may have been abusing sick leave, and that reporting was sloppy.

Two incidents of sick-leave abuse resulted in disciplinary investigations. Because of his prior abuse of sick leave, Harris was, in September, 1981, required to provide a doctor's verification of his illness before he could receive pay for days he was absent. On September 18, 1981, Harris left work six hours early on the ground that he was ill. No doctor's verification was supplied by Harris. On September 25, 1981, Harris called the station to inform his superiors that he would be an hour late for work. When he failed to report after several hours, a sergeant visited him at his home and determined that Harris was intoxicated. He was suspended without pay for two days for these actions. Harris' superiors unsuccessfully attempted to convince him to seek alcohol counseling.

Harris again failed to report to work on March 27 and 28, 1982. On March 27, 1982, Harris called in and stated that he would not report to work that day for personal reasons. Two sergeants visited his home that evening and found him in an apparently intoxicated state. When Harris called in and reported that he would not be in to work, again for personal reasons, on March 28, 1982, a sergeant called him and determined that he was intoxicated. He was apparently upset about marital problems and was somewhat threatening. The investigating sergeant's report quoted Harris as stating, "if someone comes out here, someone is going to get hurt—I'm real scared—I'm scared to come back to work." As a result of a meeting between police supervisors and the City Attorney, a proposal to impose a six-day suspension was rejected because it was apparent to the City Attorney that Harris' refusal to come to work would have been justified by Harris' mental and emotional state. In other words, he would not, or should not, have been allowed to work even if he had reported. An attempt to leverage Harris into seeking alcoholic counseling by the threat of disciplinary action was largely unsuccessful. Harris attended one perfunctory counseling session, where he denied he had an alcohol problem. No disciplinary action was taken by supervisory personnel because they concluded, when faced with the City Attorney's opinion, that Harris' absences would be considered excused by his depression.

---

1. Most of these facts are gleaned from plaintiff's response to the motion, the facts set forth by defendant City being rather conclusory. Any doubts or inconsistencies are resolved in favor of the plaintiff in accordance with the rules governing summary judgment motions. The facts regarding the actions taken by the City with respect to the various charges have been submitted by the City and are apparently undisputed. The inferences to be drawn from these facts are discussed in the opinion which follows. Finally, several individuals are named in sealed documents filed with the Court. They will be identified by initials only, since they are not parties and their identities are unnecessary to resolution of this motion.

Another incident where no disciplinary action resulted occurred in August 1981. An officer of the Town of Madison (an unincorporated area adjacent to the city) reported Harris' patrol vehicle unattended in the Town of Madison. Later in the same evening, he allegedly threatened the Town of Madison officer who had made the report with bodily harm. An investigation of this incident resulted in no disciplinary action, apparently because Harris' explanation of the unattended vehicle was plausible and because Harris' threatening of the other officer was unverifiable.

Two allegations of sexual misconduct on the part of Harris came to the attention of supervisory personnel.

In November 1979, D.H. accused Harris of sexual assault. In the accusation, D.H., a white female who had been in Madison only a short time, alleged that Harris, in the course of an investigation of a juvenile complaint which had been filed by D.H.'s boyfriend, made suggestive comments to her and then forced her to have sexual intercourse with him. The Police Department investigated the complaint by interviewing apparently all parties who could have any relevant information to offer, and by collecting physical evidence which was analyzed by the State crime lab. Harris denied any sexual contact with the woman whatsoever, and stated that the woman had made a racist comment toward him. D.H. submitted to a lie detector test which resulted in a finding that her answers concerning the incident were deceptive. The physical evidence provided no support for her story of the event. Police records indicated that D.H. had filed another sexual assault complaint in January, 1979. This complaint was investigated and the investigators concluded that the sexual contact at that time had been consensual, a conclusion which was subsequently confirmed by D.H. With regard to the investigation against Harris, the investigators sought and received records of a sexual assault complaint filed by D.H. in Omaha, Nebraska. The Omaha police investigation of this complaint was inconclusive. The suspect in that case was a fugitive and fled from Omaha.

This information was presented to the Dane County District Attorney, who declined to prosecute Harris for sexual assault and also declined to prosecute D.H. for filing a false police report.

The second allegation of sexual misconduct against Harris was still under investigation at the time of Harris' sexual assault of plaintiff. On May 2, 1982, about one month after the second disciplinary investigation for abuse of sick leave, Harris responded to a call concerning a shoplifting incident at a local store. The shoplifter, G.C., filed a complaint against Harris on May 13, 1982. She alleged that Harris made suggestive comments to her while they were alone in the back of the store, and that the comments continued as he drove her to the police station. The gist of the comments was that he, Harris, would make sure that the shoplifting charge were dropped if she would have sexual intercourse with him. She refused. G.C. was of questionable emotional stability, and two lie detector tests, on June 12 and June 22, 1982, were inconclusive. Nevertheless, it is clear that the investigators and supervisory personnel involved in the investigation believed G.C.'s story. The District Attorney was approached about a possible prosecution, which was rejected because of lack of proof. Although the District Attorney was informed that the lie detector tests on G.C. were inconclusive, he was not informed that the person administering the polygraph tended to believe the story despite the inconclusive results.

The possibility of staging a shoplifting incident to which Harris would respond was discussed on June 28, 1982 by supervisory police officials and investigators, including the Police Chief. This action was not taken. Administrative investigation continued until July 18, 1982, the date of the incident involved in this action. Until that time, however, the officers in charge of the investigation were unaware of the previous complaint filed by D.H., and they did not investigate whether Harris had ap-

proached female police officers with sexually suggestive remarks. (He had done so to at least two officers.) Nor was Harris ever confronted with G.C.'s complaint.

Two other incidents involving Harris resulted in police involvement although neither, apparently, came to the attention of supervisory personnel. On or about December 20, 1980, K.S., a white female in her mid-twenties who was suspected of prostitution, reported an incident to two members of the Metro Unit, a multi-jurisdictional drug and vice investigational unit headed by a City police lieutenant. She related that she had been performing services for a customer some months before when she was approached by a fairly-old black Madison police officer who had offered to forego arresting her if she would consent to sexual contact with him. She refused, but he did not arrest her. She could not identify the officer by name, and refused to file a complaint. After Harris was arrested for his assault on plaintiff, K.S. identified Harris as the officer involved in the incident. Although in the normal course of business in the Metro Unit, an intelligence report on K.S.'s contact would have been prepared (and apparently was prepared), and would have been routinely reviewed by the officer in charge of the Metro Unit, there is no contemporaneous record of this event.

In June, 1981, after a couple of routine contacts with Harris concerning members of her family, S.H. was subjected to suggestive comments by Harris as he continued to contact her after the police business was completed. This occurred on at least two occasions. S.H. informed her sister of the incidents, who in turn told S.H.'s estranged husband. The husband apparently complained to the Police Department. S.H. was called by the Police Department, but refused to file a complaint, apparently because she was uncomfortable dealing with the Police.

At least two other incidents of a similar type occurred before the assault of plaintiff, but were never reported to the police.

## MEMORANDUM

■ The motion of defendant Harris is meritless. The Court entertains no doubt that an on-duty police officer who uses his position to exert pressure on an unwilling victim so as to force her into sexual intercourse has violated that person's constitutional rights under color of State law.

Harris has attempted to establish, by inference from plaintiff's deposition, the fact that plaintiff consented to sexual intercourse. Even without the ensuing conviction for third-degree sexual assault,[2] the Court could not conclude from the facts cited by Harris that there are no undisputed facts concerning consent.

Plaintiff has based her claim on the notion that the Constitution protects one against violations of bodily integrity. See *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1976); and *White v. Rochford,* 592 F.2d 381, 383 (7th Cir.1981). She also alleges that Harris' actions violated her Fourth Amendment right to be free from unreasonable searches and seizures.

In *White,* the Seventh Circuit reversed the dismissal of a complaint which alleged that three minors were left unattended in a vehicle on a busy expressway by police who arrested the driver. The Court noted that "some degree of bodily integrity" is an important liberty interest protected by the Fourteenth Amendment. *Id.* at 383. Holding that the minors were protected by notions of substantive due process, the Court compared the action of the police officer in abandoning the children to the induced

**2.** Harris was convicted of a violation of Wis. Stats. 940.225(3):

> Third Degree Sexual Assault. Whoever has sexual intercourse with a person without the consent of that person is guilty of a Class D Felony.

Harris can hardly argue that plaintiff's consent is established in the face of his conviction under this statute. However, the Court has not attempted to determine the collateral effect of this conviction in this action because the parties have not addressed it. But *see* 1A *Moore's Federal Practice* ¶ 0.418[1] (1982).

vomiting in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), which was held to be shocking to the conscience and offensive to a sense of justice. *White*, at 383.

The Court can entertain no doubt that an unconsented sexual assault by an on-duty police officer is at least as offensive to conscience and justice as the above mentioned cases. Harris' argument to the contrary is so lacking in merit as to approach the absurd. If excessive force during an arrest violates the Constitution, *Clark v. Ziedonis*, 513 F.2d 79 (7th Cir.1975), the actions of defendant Harris certainly do.

Harris' argument concerning the search and seizure question is also without merit. The suggestion that any "seizure" of plaintiff ended when Harris propositioned her is a debatable inference from the facts of this case which must be left to the jury. Furthermore, it could be inferred from the facts, as plaintiff points out, that notions of probable cause never entered into Harris' motivation from the moment plaintiff was seized. Finally, it has been clear since *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) that it is no defense to assert that a police officer was acting in excess of his lawful authority.

Using the same inferences from plaintiff's deposition, Harris attempts to argue that there was no assault and battery under the State common law. While imaginatively parsing the separate elements of assault and battery, and arguing that intent to harm was absent, Harris has ignored the admonition in the case he cites for support:

If a defendant acts intending to cause contact and the contact is unpermitted ... it follows that the intent is also unlawful.

*McCluskey v. Steinhorst*, 45 Wis.2d 350, 173 N.W.2d 148, 152 (1970).

Defendant Harris' motion will be denied.

The motion for summary judgment on behalf of the City and its Police supervisory personnel is more difficult. Plaintiff's claim against the City is based on allegations that the City and its officials failed to screen Police candidates for assaultive pro-

clivities, failed to take appropriate precautions to prevent injuries to the plaintiff in the face of the prior charges of misconduct and sexual abuse by Harris, failed to fully investigate prior complaints against Harris, and, in general, failed to properly train and supervise police officers. As plaintiff poses the issue in her brief:

It is plaintiff's contention that the City, through its officials, was negligent, grossly negligent or reckless in failing to properly and adequately investigate the [K.S., S.H., and G.C.] incidents, and was further negligent and reckless in failing to take proper precautions to protect the public from Charles Harris during the alleged pendency of the investigation of [G.C.].

In addition to the failure to properly investigate the prior complaints, the exhibits show that the City, through its officials, was aware that in late March, 1982 Charles Harris was having emotion, mental and marital problems so that it became imperative when the G.C. complaint was made in May, 1982 to move promptly and thoroughly on that complaint and to take appropriate precautions to protect the public during that investigation by removing Charles Harris from his then assigned duties of patrol to a position where he was more stringently supervised. Instead, the City, in a gross act of negligence, assigned him to a duty shift where he was less supervised than normal. He was on this unsupervised assignment when he accosted and sexually assaulted the plaintiff.

Plaintiff further argues that the City and its officials should be faulted, during the G.C. investigation, for failing to check the files for prior complaints; for failing to complete the G.C. investigation in a timely manner (interviews of many witnesses did not take place until after the assault on plaintiff); and for failing to interview female officers to see if they had been approached by Harris.

Set against the standard applicable to judging municipal and supervisory liability for the constitutional torts of employees,

the facts of this case fall far short of the mark. Perhaps the clearest statement of this standard is in the case of *Starstead v. City of Superior*, 533 F.Supp. 1365 (W.D. Wis.1982). Citing *Owens v. Haas*, 601 F.2d 1242, 1246 (2nd Cir.1979), the Court stated:

> Liability has attached only when "The failure to supervise or the lack of a proper training program was so severe as to reach the level of 'gross negligence' or 'deliberate indifference' to the deprivation of the plaintiff's constitutional rights."

*Starstead*, at 1370. Applying the same kind of standard, the Court in *Lenard v. Argento*, 699 F.2d 874 (7th Cir.1983), upheld a jury verdict exonerating a municipality. The evidence in that case did not show any degree of recklessness on the part of the municipality, and the facts would allow for no inference of tacit authorization of unconstitutional conduct.

Because of certain similarities, the Seventh Circuit's comments in another case are enlightening. In *Beard v. Mitchell*, 604 F.2d 485 (1979), the Court reviewed a jury verdict in favor of a defendant FBI officer who had allegedly violated the constitutional rights of a murder victim killed at the hands of a police officer. The defendant was liable, according to plaintiff's theory, for failing to arrest the murderer prior to the murder of the deceased, and for failing to properly supervise an FBI informant who arguably participated in the murder. The police officer who was a murder suspect was not arrested prior to the murder in question despite the informant having witnessed, and reported to the FBI, a number of criminal acts, including extortion, battery and murder. The informant failed to save the victim despite at least two opportunities to do so. These facts were largely undisputed.

The Court specifically approved an instruction concerning the defendant's liability which required that the defendant must have acted, or failed to act, "with a deliberate or reckless disregard of Jeff Beard's constitutional rights." *Id.* at 498, n. 18.

The facts of the case before this Court allow no inference of conduct on the part of the City or its police supervisors which approaches this standard. The investigation of the D.H. incident appears to have been very thorough. The K.S. and S.H. incidents were not investigated prior to the incident on which this complaint is based because the victims never filed complaints. It appears that K.S. never even identified Harris until after this case became public. S.H. now claims that she refused to go forward with a complaint because she was uncomfortable about dealing with male officers. The Court also notes that the S.H. incident is significantly different from any other incidents in that Harris never was in a position to use the leverage of his position to overcome her resistance.

Harris' other disciplinary and emotional problems cannot be used to create an inference of recklessness in that these problems provide no indication that Harris would take the kind of action he took. There is no evidence that these problems had anything to do with what happened to plaintiff. The only inferences are to the contrary. Several of the incidents predate any indication of emotional instability.

Only the police response to the G.C. incident provides any opportunity for serious Monday-morning quarterbacking. Plaintiff makes the most of it. A jury might decide that a more thorough check of prior statements about Harris would have been helpful, and might also decide that Harris should have been confronted with the charge. However, it is clear that the people in charge of the investigation needed little convincing that Harris was guilty more than two weeks before the July 18 assault of plaintiff. Perhaps the most damning thing that can be said about police conduct in this investigation is that Harris was not pulled from the street during the period charges were pending. Yet even this decision was not reckless or grossly negligent. It appears that the police supervisors consciously decided to keep Harris in the dark while continuing the investigation, perhaps because they hoped the investiga-

tion would be fruitful, or perhaps because they wanted to keep open the option of setting Harris up with a wired victim of their choosing. The decision can be second-guessed, but it cannot be termed grossly negligent or reckless.

Accordingly, the motion of the City and its officers for summary judgment on the Federal claims in the complaint must be granted.

With regard to the pendent State claims,[3] the City and its officers argue that summary judgment is proper because the officers are subject to State common-law immunity for their discretionary acts, the City is immune under a statute granting immunity for quasi-judicial acts, and because plaintiff, by failing to file a sufficient notice of claim, cannot establish subject matter jurisdiction.

The basis of the common law immunity claimed for the City officials (who are not named specifically in this suit as yet) was recently restated in *Maynard v. City of Madison*, 101 Wis.2d 273, 304 N.W.2d 163, 167 (App.1981). The general rule was stated as "a public employee who acts within the scope of his official authority and in the line of his official duties is immune from personal liability." (citations omitted.) The exceptions to the general rule are for negligence in the performance of a ministerial duty, and for discretionary acts wholly outside of the official's authority. *Id.* There is no way to characterize plaintiff's claims against the City officials except as negligent action or inaction within the scope of their discretionary authority.

■ There was nothing ministerial about their alleged failure to pull Harris off the street, to supervise Harris properly, to train other officers in proper techniques to avoid the kind of harm which befell the plaintiff, to screen police candidates more thoroughly, or any other of the litany of deficiencies in police practice enumerated by plaintiff. All of these actions or inactions involved the exercise of discretion and

judgment, and are neither ministerial nor outside of the authority of these officials. *Id.* 304 N.W.2d at 168, citing *Scarpaci v. Milwaukee County*, 96 Wis.2d 663, 292 N.W.2d 816 (1980).

Accordingly, the State-based negligence claims against the unnamed city officials must be dismissed pursuant to the motion for summary judgment.

The City itself attempts to ground its immunity on two separate clauses of the same statute, Wis.Stats. § 893.80(4), which provides as follows:

> No suit may be brought against any ... governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such ... subdivision ... or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

The City argues that, because Harris' act against the plaintiff was in the nature of an intentional tort, the first clause of the statute bars this action against it. It appears to this Court that the City mischaracterizes plaintiff's claim. The claim is not one of *respondeat superior* against the City for the intentional tort of Harris. Rather, plaintiff attempts to base the City's liability independently on negligence by the City and its officers. Despite some doubt in this regard, the Court must conclude that a case of simple negligence can, perhaps, be made.

However, plaintiff is, as the City asserts, bootstrapping Harris' intentional tort into a claim against the City. Whether plaintiff can do this is an open question in Wisconsin. *See Salerno v. City of Racine*, 62 Wis.2d 243, 214 N.W.2d 446, 448, n. 4 (1974). The extent of the immunity granted under the statute to a municipality for the intentional torts of its agents could be read as absolutely absolving the municipali-

---

**3.** The Court notes that it has Federal jurisdiction of these claims also through diversity of citizen-

ship and amount in controversy.

ty of liability whenever the direct cause of harm is an intentional tort. Or, it could be read only to grant immunity from *respondeat superior* liability. Since "the rule is liability—the exception is immunity," *Holytz v. Milwaukee*, 17 Wis.2d 26, 115 N.W.2d 618, 625 (1962), it appears to the Court that the latter approach is the correct one. The first clause of the statute does not immunize the municipality when there is a basis of liability independent from the intentional tort of the employee. This result is mandated by the strict construction of the statute mandated by the state's highest Court.

However, the Court in *Salerno*, facing a question strikingly similar to this one, determined that the availability of quasi-judicial immunity under the second clause of the statute quoted above was a threshold question (perhaps because it was an easier question on the facts of that case). In *Salerno*, the plaintiff, in attempting to recover against the City for being subjected to excessive force by a police officer in making an arrest, grounded his complaint on the dual theory of liability of the City for the intentional tort of the officer, and for the City's negligence in failing to discharge the officer for his already apparent propensity to use excessive force.

The Court held that the City's failure to discharge the officer for his prior acts was covered by the immunity granted for quasi-judicial acts. Because the steps involved in removing an officer included three steps (a complaint, a hearing, and selection of a disciplinary measure), the Court determined that the decision not to discharge the officer was quasi-judicial. In commenting upon *Salerno* in a later case, the Court stated that these were "the minimum requirements for determining whether or not an action is quasi-judicial." *Coffey v. City of Milwaukee*, 74 Wis.2d 526, 247 N.W.2d 132, 136 (Wis.1976). The City here has not offered any evidence that the action suggested by plaintiff as representing the foremost argument for liability, failing to remove Harris from the street during pendency of the G.C. investigation, was subject to these requirements.

It can be argued, however, that a decision not to remove Harris from the street is just as discretionary as a decision not to discharge. "Discretion" has been held to be synonymous with "quasi-judicial." *Scarpaci v. Milwaukee County*, 96 Wis.2d 663, 292 N.W.2d 816, 825–26 (1980); *Lifer v. Raymond*, 80 Wis.2d 503, 259 N.W.2d 537 (1977). In *Scarpaci*, for instance, the decision of whether to perform an autopsy was held to be quasi-judicial despite the fact that the notice and hearing process, held to be basic in *Coffey*, were not present. On the other hand, the decisions made in the performance of the autopsy were held to be not quasi-judicial because the discretion exercised was medical rather than governmental. *Scarpaci*, 292 N.W.2d at 827.

■ Reconciling the *Salerno/Coffey* formulation with that in *Scarpaci* is difficult. One way to do so would be to analyze the nature of the decisions made in light of the comments of the Restatement of Torts (Second) discussed in *Scarpaci*. *Id*. According to the Restatement, it is only when the determination is one of a "fundamental governmental policy" and requires "basic policy evaluation, judgment, and expertise" that the immunity should attach. *Id*., citing 4 Restatement of Torts (Second) §§ 895B, C and D (Comments) (1977). In a sense, every decision on how to investigate and discipline a police officer involves basic policy questions when there is no apparent standard procedure to follow given the facts of a specific case. On the other hand, the discretion involved could be described as relating to management rather than government. The Court finds the former analysis more compelling than the latter, if only because the latter has the same kind of faults inherent in the old governmental/proprietary interest analysis which has been rejected. *See* 61 *Marquette Law Review* 163 (1977). Yet this Court finds no evidence in *Scarpaci*, despite the use of the governmental/medical dichotomy, that the Wisconsin Supreme Court would choose to label the acts here managerial rather than

governmental. The operation of a police department being so inherently governmental (using the old governmental/proprietary analysis), the Court believes that the Wisconsin Court would come down on the side of immunity.

Even if this were not the case, this Court believes that there is another reason to hold the acts and omissions in this case to be quasi-judicial. The litany of inadequacies on the part of the City cited by the plaintiff which precede the G.C. incident can be read in only one way. Plaintiff is attempting to create a picture of a Police Department that was deficient in investigating one of its officers. When faced with the G.C. complaint, the City should have been prepared to act against Harris prior to the assault on the plaintiff. Plaintiff has chosen to frame the question by stating that the action which should have been taken was to remove Harris from the street pending investigation. The Department could have taken this kind of action without (apparently) any recourse to notice and hearing. It is this fact, and this alone, which can differentiate this case from *Salerno*, where the question was framed as a duty to discharge. Plaintiff could just as well have framed the question in this case as a duty to discharge because Harris' conduct, even before the assault on plaintiff, would have justified removal from the force.

The Court must conclude that it is plaintiff's totally artificial framing of the question of the Police Department's duty that keeps this case from being on point with *Salerno*. If plaintiff had claimed that the violation of the City's duty of care was its failure to discharge Harris prior to the assault, *Salerno* would have been dispositive. Plaintiff cannot escape this result by the artifice of stating the City's duty as something less than discharge, the violation of which is not subject to immunity. The duty which was violated by the City is something more general—failure to protect the public from one who used his position of authority to sexually assault a member of the public. This series of acts or omissions arguably constitutes negligence with

regard to that duty, and plaintiff was thereby harmed. Because Harris would have remained in a position to abuse his position as long as he remained on the force, the City could live up to its duty only by discharging Harris. Its failure to do so is immune under *Salerno*. It can make no difference that plaintiff would not have been assaulted at that time and place if Harris had been removed from the street. She would not have been assaulted had Harris been discharged either.

It is, therefore, illogical to suggest that the City ought to be immune for not taking the action which would be most protective of the public but not immune for failing to take the less protective course. The Court must, therefore, hold that the *Salerno* decision is on point and that the City is immune from liability because its decision was quasi-judicial. Since any acts or omissions which predated the assault on the plaintiff would have been part of the ultimate decision, all alleged failures of the City with regard to its decision must be considered quasi-judicial acts as well. In other words, since the decision itself was quasi-judicial, any failure or inadequacies which contributed to the decision are also immune.

The City's motion with respect to plaintiff's failure to comply with Wis.Stats. § 893.80(1)(b) need not be answered in light of the foregoing. The statute requires itemization of damages. The Court notes that the decision relied upon, *Figgs v. City of Milwaukee*, 116 Wis.2d 281, 342 N.W.2d 254 (App.1983), is a recent Court of Appeals decision, not a statement of the State's highest court. Further, the decision is short on the facts. That is, it is not clear that plaintiff's notice of injury is as deficient as the one held insufficient in *Figgs*. Plaintiff listed the damage items and concluded with a claim for total damages. As far as the Court can tell, the *Figgs* plaintiff may have filed for a damage amount without specifying injuries. The Court would decline to dismiss on this basis.

## CONCLUSION

It appears clear that a sexual assault by an on-duty police officer constitutes a violation of a constitutional right under color of State law. Defendant Harris' contentions that plaintiff consented to sexual intercourse can hardly be said to be undisputed in light of his conviction for sexual assault.

The acts and omissions of the City and its officials cannot be termed reckless or grossly negligent and, therefore, do not rise to constitutional significance.

Supervisory City officials are immune from liability under *Maynard v. City of Madison,* 101 Wis.2d 273, 304 N.W.2d 163, 167 (App.1981). The City itself is immune from liability under Wis.Stats. § 893.80(4) because the actions of City officials were quasi-judicial under *Salerno v. City of Racine,* 62 Wis.2d 243, 214 N.W.2d 446 (1974).

Accordingly,

## ORDER

IT IS ORDERED that defendant Harris' motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that the motion for summary judgment on behalf of the City of Madison and unknown officers, agents and employees of the City is GRANTED.