**Linda K. WOOD, Plaintiff–Appellant,**

v.

**Steven C. OSTRANDER; Neil Maloney, Defendants–Appellees.**

**No. 87–3924.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 1988.

Reargued and Resubmitted on Rehearing Nov. 28, 1988.

Decided June 27, 1989.

---

Paul Lindenmuth and Neil J. Hoff, Tacoma, Wash., for plaintiff-appellant.

Theresa L. Fricke, Asst. Atty. Gen., Olympia, Wash., for defendants-appellees.

Before FLETCHER and THOMPSON, Circuit Judges,* and CARROLL, District Judge.**

---

* After Judge Anderson's death, Judge Thompson was substituted for Judge Anderson. He has listened to the tape of the initial oral argument, has read the briefs and excerpt of record, and has heard oral argument on rehearing.

** Honorable Earl H. Carroll, United States District Judge for the District of Arizona, sitting by designation.

DAVID R. THOMPSON, Circuit Judge:

 Linda Wood brought this action under 42 U.S.C. § 1983 against Washington State Trooper Steven Ostrander and his wife, and Neil Maloney, Chief Officer of the Washington State Patrol and his wife. Wood appeals the district court's summary judgment dismissal of the case as to all defendants. We affirm the district court's dismissal as to Maloney and his wife, but reverse the dismissal as to Ostrander and his wife.[1]

## FACTS

At 2:30 a.m., on the morning of September 23, 1984, Trooper Ostrander pulled a car to the side of the road for driving with its high beams on. Ostrander determined that the driver, Robert Bell, was intoxicated and placed him under arrest. Ostrander called for a tow truck to have the car impounded, and returned to the car and removed the keys. Wood, who was sitting in the car, asked Ostrander how she would get home. Ostrander replied that he was sorry, but that Wood would have to get out of the car. These facts are not disputed. Wood claims that Ostrander simply returned to his patrol car and drove away. Ostrander claims that he offered to call a friend or family member who could give Wood a ride home, but that she declined the offer. Although Wood claims that she did not see any open business at the time Ostrander drove away, Ostrander claims that a Shell service station and a Seven–

Eleven store were clearly visible and open for business. Ostrander further claims that Wood was picked up by an unknown driver before Ostrander drove away, although Bell and Wood dispute this.

Ostrander left Wood near a military reservation in the Parkland area of Pierce County, which has the highest aggravated crime rate in the county outside the City of Tacoma. The temperature was fifty degrees and Wood was wearing only a blouse and jeans. Wood alleges that after walking one-half block toward her home, which was five miles away, and having turned down rides offered by three or four strangers, she accepted a ride with an unknown man. The driver took Wood to a secluded area and raped her.

The district court denied defendants' first summary judgment motion, ruling that Ostrander's actions could not be characterized as merely negligent. Subsequently, the district court granted defendants' second motion for summary judgment, on the ground that Ostrander was entitled to good faith qualified immunity, and that Ostrander owed no "affirmative constitutional duty of protection" to Wood.[2]

 We review the district court's grant of summary judgment de novo to determine whether there is any genuine issue of material fact and whether the substantive law was correctly applied. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986). All facts in the record and inferences drawn from them must be viewed in the

---

1. Wood has not presented any argument on appeal, or raised any issue, challenging the district court's dismissal of the case as to Maloney and his wife. It is well settled in this circuit that claims not addressed in an appellant's brief are deemed abandoned, absent a showing that manifest injustice will result. *United States v. Loya*, 807 F.2d 1483, 1487 (9th Cir.1987); *Collins v. City of San Diego*, 841 F.2d 337, 339 (9th Cir.1988). No such showing has been made in this case.

 The claim against Mrs. Ostrander is different. Although no mention of her is made in the appellant's brief, it appears she was named as a defendant in the case solely for the purpose of attempting to subject the marital community of the Ostranders to liability for any judgment which might be entered against Trooper Ostrander. *See Brink v. Griffith*, 65 Wash.2d 253, 396

P.2d 793, 795 (1964). We express no opinion on the merits of the claim against Mrs. Ostrander. However, given the limited purpose of this claim and its dependency on the claim against Trooper Ostrander, we do not deem it to have been abandoned at this time.

2. The district court did not rule on defendants' argument that the damages claim should be dismissed on proximate cause grounds. Although this court could presumably affirm on that basis if it had legal merit and factual support in the record, *see, e.g., Lee v. United States*, 809 F.2d 1406, 1408 (9th Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 772, 98 L.Ed.2d 859 (1988), defendants have not raised the proximate cause argument on appeal. We have not examined its merits.

light most favorable to the non-moving party. *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1250 (9th Cir.1982), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983).

## DISCUSSION

### I. *Viability of the Section 1983 Claim*

■ To sustain an action under section 1983, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right. *Rinker v. County of Napa*, 831 F.2d 829, 831 (9th Cir.1987) (citing *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981)). It is not disputed that in arresting Bell and impounding the car, Ostrander was acting under color of state law. Ostrander argues, however, that Wood has failed to state a claim cognizable under section 1983 because, first, his conduct was at most negligent and, second, Wood has adequate state remedies to pursue her claim. These issues are considered in turn.

### A. *The "Mere Negligence" Bar*

■ In *Daniels v. Williams*, 474 U.S. 327, 330–32, 106 S.Ct. 662, 664–65, 88 L.Ed. 2d 662 (1986), and *Davidson v. Cannon*, 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986), the Supreme Court held that mere negligence or lack of due care by state officials does not trigger the protections of the fourteenth amendment and therefore does not state a claim under section 1983. In doing so, the Court overruled that part of *Parratt*, 451 U.S. at 536–37, 101 S.Ct. at 1913, which held that a negligent loss of property by state officials could be a "deprivation" under the due process clause. *Daniels*, 474 U.S. at 330–31, 106 S.Ct. at 664–65. However, the Court expressly left open the question

"whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." *Id.* at 334 n. 3, 106 S.Ct. at 667 n. 3.

A number of circuits have held recklessness or gross negligence sufficient to state a section 1983 claim; none has held that only intentional misconduct will suffice. *See, e.g., Taylor v. Ledbetter*, 818 F.2d 791, 793 (11th Cir.1987) (en banc) (claim that state officials "were 'grossly negligent' or 'deliberately indifferent' " is "sufficient to overcome either a *Daniels* or *Davidson* bar"); *Vinson v. Campbell County Fiscal Court*, 820 F.2d 194, 199–200 (6th Cir.1987) (gross negligence cognizable under section 1983); *White v. Rochford*, 592 F.2d 381, 385 (7th Cir.1979) (gross negligence or reckless disregard for the safety of others cognizable); *see also Davidson v. O'Lone*, 752 F.2d 817, 828 (3rd Cir.1984) (en banc), *aff'd sub nom., Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (gross negligence or reckless indifference sufficient) (plurality view).[3]

The law in this circuit is unclear. In *Fargo v. City of San Juan Bautista*, 857 F.2d 638 (9th Cir.1988) we stated that "grossly negligent or reckless official conduct that infringes upon an interest protected by the due process clause is actionable under section 1983." *Id.* at 640. We based this statement, however, on the first opinion in this case, *Wood v. Ostrander*, 851 F.2d 1212, 1214–15 (9th Cir.1988). The first *Wood* opinion has been amended by this opinion. Moreover, the gross negligence standard which we articulated in our first *Wood* opinion was based on *Ketchum v. County of Alameda*, 811 F.2d 1243 (9th Cir.1987). *Ketchum* involved a claim by a woman who was raped by an escaped inmate. The victim contended the county had been grossly negligent in maintaining security at the facility where the inmate had been confined. We affirmed summary

---

3. *Jackson v. City of Joliet*, 715 F.2d 1200, 1206 (7th Cir.1983), *cert. denied*, 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984), is not *contra*. There, the court found that a grossly negligent rescue attempt was not actionable under section 1983 where the plaintiff's decedents were already trapped in a burning car when the police arrived. The court expressly distinguished cases in which the state officials' actions created the danger or created a special duty of protection toward the plaintiff. *See id.* at 1204–05. We discuss *Jackson* in more detail *infra*.

judgment in favor of the state defendants on the ground that the victim, as a member of the public at large, did not have "a special relationship with the state or the criminal," and hence "had no federal constitutional right to state protection from criminal attacks." *Id.* at 1247. We did not decide the question of what culpability standard would have been applicable if such a relationship had existed. *Id.* at 1246 n. 3.

The Supreme Court has recently adopted the standard of deliberate indifference as the culpability standard necessary to establish section 1983 liability of a municipality based upon a claim that the municipality's lack of training for police officers was a policy causing a violation of a constitutional right of a person subject to police action. *City of Canton v. Harris,* — U.S. —, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Court in *Canton* expressly reserved the question whether the deliberate indifference standard would also apply to "an underlying claim of a constitutional violation." *City of Canton v. Harris,* 109 S.Ct. at 1204 n. 8. Despite this reservation, however, *Canton* calls into question our statements in *Fargo* and in our prior opinion in this case that a showing of gross negligence will suffice to establish the requisite level of fault in a section 1983 action against an individual state actor such as Trooper Ostrander.

Here, however, Wood has raised a genuine issue of fact tending to show that Trooper Ostrander acted with deliberate indifference to Wood's interest in personal security under the fourteenth amendment. *See Taylor v. Ledbetter,* 818 F.2d at 793, 795–97 (deliberate indifference to victim's well-being is more than negligence and supports section 1983 claim); *Davidson v. O'Lone, supra,* 752 F.2d at 828; *see also*

*Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), *reh'g denied,* 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977) (prison officials' deliberate disregard of prisoner's serious illness or injury violates eighth amendment and is cognizable under section 1983). The rationale underlying *Daniels'* bar of negligence-based section 1983 claims is that mere lack of due care, such as leaving a pillow on the prison stairs (*Daniels*) or mislaying an inmate's property (*Parratt*) is "quite remote" from the fourteenth amendment's purpose of redressing abuses of power by state officials. 474 U.S. at 332, 106 S.Ct. at 665. In the present case, the facts put in issue by Wood—that Ostrander arrested the driver, impounded the car, and left Wood by the side of the road at night in a high-crime area—show an assertion of government power which, according to Wood's version of the case, tends to show a disregard for Wood's safety amounting to deliberate indifference.[4]

B. *The "State Remedies" Bar*

■ *Parratt v. Taylor,* 451 U.S. at 541–44, 101 S.Ct. at 1916–17, and its progeny hold that a deprivation of liberty or property is not cognizable under section 1983 when a state's post-deprivation remedies are adequate to protect a victim's procedural due process rights. *See, e.g., Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).[5] However, "[t]he *Parratt* line of cases does not focus on the relevance of procedural protections to alleged violations of *substantive* constitutional rights." *Smith v. City of Fontana,* 818 F.2d 1411, 1414 (9th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 311, 98 L.Ed.2d 269 (1988). Accordingly, the existence of state remedies is irrelevant and the *Parratt* bar inapplicable where the plaintiff alleges a violation of a substantive right

---

4. A jury presented with these facts might find Ostrander's conduct to have been "deliberately indifferent," "reckless," "grossly negligent," or merely "negligent." *See Fargo v. City of San Juan Bautista,* 857 F.2d 638, 641 (9th Cir.1988) ("When reasonable persons may disagree as to whether particular conduct constitutes negligence, gross negligence or recklessness, the question is one of fact to be decided by a jury." (footnote omitted)). It is thus likely the district

court will face the difficult task of defining for the jury the terms "negligence," "gross negligence," "recklessness," and "deliberate indifference." *See Daniels,* 474 U.S. at 334–35, 106 S.Ct. at 666–67; *Fargo,* 857 F.2d at 641–42.

5. This aspect of *Parratt* was not overruled by *Daniels.*

under either the Bill of Rights or the due process clause. *Smith,* 818 F.2d at 1415; *accord Mann v. Tucson Dept. of Police,* 782 F.2d 790, 792–93 (9th Cir.1986) (per curiam); *see also Daniels,* 474 U.S. at 337–39, 106 S.Ct. at 677–79 (Stevens, J., concurring) (section 1983 claim alleging violation of substantive due process not barred by existence of state remedy); *Parratt,* 451 U.S. at 545, 101 S.Ct. at 1917 (Blackmun, J., concurring) (due process clause extends beyond procedural matters).

 Ostrander argues that the existence of a state tort remedy for Wood precludes the section 1983 claim under *Parratt.* According to Ostrander, the only distinction between this case and the *Parratt* line is that *Parratt* and its progeny involve deprivations of property whereas this case involves an alleged deprivation of liberty. *See Ingraham v. Wright,* 430 U.S. 651, 674–75, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977) (child had liberty interest in personal security and freedom from restraint and infliction of pain). Ostrander argues that we should anticipate a Supreme Court holding to the effect that *Parratt* extends to deprivations of liberty, because the Court cited certain section 1983 cases involving assaults to support its conclusion that *Parratt* extends to intentional deprivations of *property.* *See Hudson v. Palmer,* 468 U.S. at 531 n. 10, 533–34 n. 14, 104 S.Ct. at 3202 n. 10, 3204 n. 14. Ostrander also relies on this court's decision in *Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1352 (9th Cir.1981), *aff'd sub nom. Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983), which held in part that a college football coach's assault on a player was not cognizable under section 1983.

Ostrander's argument is unpersuasive, because it follows the wrong axis of analysis. This circuit has analyzed *Parratt* and its progeny not by distinguishing liberty versus property deprivations, but rather by analyzing substantive versus procedural rights deprivations. *See, e.g., Smith v. City of Fontana,* 818 F.2d at 1414–15. The relevant inquiry is whether the deprivation is sufficiently serious that " 'the con-

stitutional line ha[s] been crossed' so as to constitute a deprivation of substantive due process." *Rutherford v. City of Berkeley,* 780 F.2d 1444, 1447 (9th Cir.1986). *Ingraham* and *Rutledge* do not suggest otherwise. In *Ingraham,* the Court considered only a procedural due process challenge based on the lack of a hearing before corporal punishment was meted out. *See* 430 U.S. at 674, 680–83, 97 S.Ct. at 1417–19. In *Rutledge,* this court did not analyze the seriousness of the assault, deciding that *Parratt* was preclusive of such inquiry. 660 F.2d at 1352. To the extent that *Rutledge* found *Parratt* to bar section 1983 claims for substantive rights violated by official assaults, it does not survive this court's en banc ruling in *Haygood v. Younger,* 769 F.2d 1350, 1356 (9th Cir. 1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). More generally, substantive due process violations comprise those acts by the state that are prohibited "regardless of the fairness of the procedures used to implement them." *Daniels,* 474 U.S. at 331, 106 S.Ct. at 665.

 The seriousness of the official misconduct may determine whether "the constitutional line" between a procedural and a substantive due process violation "has been crossed," so that the availability of state court relief will not bar a section 1983 claim. Clearly, the line is crossed in instances of serious police brutality. *See, e.g., Rutherford,* 780 F.2d at 1448. But *Rutherford* only "[p]artially answer[ed] the question left open in *Haygood*" as to whether "official assaults, batteries or other invasions of personal liberty" amount to substantive due process violations. *Id.* While brutality by police or prison guards is one paradigmatic example of a substantive due process violation, it does not exhaust the possibilities.

Although Ostrander did not himself assault Wood, he allegedly acted in callous disregard for Wood's physical security, a liberty interest protected by the Constitution. *See Ingraham v. Wright, supra.*

Wood has raised a triable issue of fact as to whether Ostrander's conduct "affirmatively placed the plaintiff in a position of

danger." *Ketchum*, 811 F.2d at 1247; *see Jackson v. City of Joliet*, 715 F.2d at 1204 (distinguishing situation where arrest creates the danger, actionable under section 1983, from situation where danger existed before defendant acted); *see also DeShaney v. Winnebago Cty. Soc. Servs. Dept.*, — U.S. —, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249 (1989) (distinguishing situation where state "played no part" in creating the dangers that minor child faced by remaining in his father's custody "nor did [the state] do anything to render [the child] any more vulnerable to them."). The fact that Ostrander arrested Bell, impounded his car, and apparently stranded Wood in a high-crime area at 2:30 a.m. distinguishes Wood from the general public and triggers a duty of the police to afford her some measure of peace and safety. *See White v. Rochford*, 592 F.2d at 384 & n. 6 (and authorities cited therein). *See also Chambers–Castanes v. King Co.*, 100 Wash.2d 275, 669 P.2d 451 (1983); Plaintiff's Opposition to Summary Judgment, Exhibits 1, 2(c) (policy of state police to respond to requests for assistance in courteous and judicious manner).

Wood also has raised at least a triable issue (if not an undisputed one) regarding Ostrander's knowledge of the danger: official crime reports show that the area where Wood was stranded had the highest violent crime rate in the county outside the City of Tacoma. Ostrander, a state trooper stationed in that area since 1981, may well be chargeable with knowledge of these facts. Moreover, the inherent danger facing a woman left alone at night in an unsafe area is a matter of common sense. *Cf. White v. Rochford, supra.*

Most of the factual disputes in this case go to the issue of danger. Defendants contend, and the trial court found, that a 24–hour Shell station and a 24–hour Seven–Eleven store were located within two blocks of the location of the stop. Defendants further contend that there were paved sidewalks. Even if there is no genuine factual dispute as to these matters, their relevance is open to question by the trier of fact. The district court and the defendants too readily assume that Wood's travail would have been over if she had only gone to the Shell station or the Seven–Eleven. It is for the trier of fact to determine whether a reasonable person should have regarded a gas station or convenience store, located in a high crime neighborhood, as some kind of safe haven where she would have been given assistance or permitted to stay until daybreak before walking five miles home. Nor is a telephone much help to a person who allegedly has no money to place a call and no one to call.[6] These factual assumptions, either expressly or impliedly made, are particularly inappropriate for the district court to make on summary judgment.

There is a factual dispute as to whether Ostrander made any inquiry at all as to Wood's ability to get safely home, or whether, instead, he ignored her request for help. Certain evidence suggests that Ostrander untruthfully told his superiors that he was told that Wood was being picked up by some "friends," (Exhibit 4 to Plaintiff's Summary Judgment Opposition), and it is disputed whether Ostrander saw Wood picked up at all. Moreover, we cannot resolve on our review of summary judgment whether Wood acted unreasonably by accepting a ride with an unknown man. The resolution of these questions is for the trier of fact.

We are satisfied that Wood has presented genuine issues of material fact on the question of whether Ostrander deprived her of a liberty interest protected by the Constitution. *See Ingraham v. Wright, supra; Haygood v. Younger*, 769 F.2d at 1356.

---

6. Wood alleged that she had little or no money on her person at the time Ostrander put her out of the car. Although she lived with her parents, she did not try to call them for help because, according to her allegations, they would have been unable to pick her up: her mother has night-blindness and her stepfather suffers from brain damage. How much of these circumstances Wood may have told Ostrander is not clear from the record. Ostrander denies knowledge of any of these allegations.

## II. *Qualified Immunity*

 State officials cannot be held liable for damages under section 1983 unless their conduct violates a clearly established constitutional right. *Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139, *reh'g denied*, 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919 (1984). Officials are entitled to qualified immunity if their conduct is objectively reasonable " 'as measured by reference to clearly established law.' " *Id.* at 191, 104 S.Ct. at 3017 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed. 2d 396 (1982)). Ostrander is entitled to summary judgment based on qualified immunity if he can show that as a reasonable officer he could have believed his actions toward Wood were constitutional even if they were not. *Vaughan v. Ricketts*, 859 F.2d 736, 739 (9th Cir.1988). *See Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The district court concluded that Ostrander was shielded by qualified immunity. We review this conclusion de novo. "Assuming that [Wood] can prove the acts attributed to [Ostrander], we must decide the entirely legal issue of 'whether the facts alleged ... support a claim of violation of clearly established law.' " *Vaughan v. Ricketts*, at 739 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528 n. 9, 105 S.Ct. 2806, 2816 n. 9, 86 L.Ed.2d 411).

 The events on which Wood predicates her section 1983 claim occurred September 23, 1984. We have held above that Wood has raised genuine issues of material fact as to a number of these events. If the events occurred as Wood alleges, she has stated a violation of her constitutional right to personal security, a liberty interest protected by the fourteenth amendment. *See Ingraham v. Wright, supra,* We now consider, in light of Ostrander's qualified immunity defense, whether a reasonable police officer in his position could have believed on September 23, 1984, that his treatment of Wood, as alleged by her, comported with the Constitution even though, assuming the trier of fact accepts Wood's version of the case, it actually did not.[7] To resolve this question, we must "survey the legal landscape" as it existed in September 1984 to determine whether it had been clearly established at that time that Ostrander's alleged conduct violated Wood's liberty interest under the Constitution.[8] *Ward v. County of San Diego*, 791 F.2d 1329, 1332 (9th Cir.1986), *cert. denied*, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).

### A. *The Law in 1984*

In *Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir.1985), this court held that "in the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established under the *Harlow* test." *Accord, Bilbrey v. Brown*, 738 F.2d 1462, 1466 (9th Cir.1984). The available decisional law includes cases from state courts, other circuits and district courts. *Ward v. County of San Diego*, 791 F.2d at 1332.

---

7. Should the trier of fact find that Ostrander's treatment of Wood was deliberately indifferent, this alone might deprive Ostrander of his qualified immunity defense. *See Wood v. Sunn*, 865 F.2d 982, 987 (9th Cir.1988) ("Despite [*Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ], the [rule of *Albers v. Whitley*, 743 F.2d 1372, 1376 (9th Cir.1984), *reversed on other grounds*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) ] that 'a finding of deliberate indifference is inconsistent with ... qualified immunity' remains the law of the circuit."). We do not reach this issue, however, because we hold *infra* that apart from the applicable culpability standard for Ostrander's conduct, he is not entitled to qualified immunity under the facts presented by Wood.

8. Wood also argues that Ostrander's treatment of her was so egregious that it "shocks the conscience" and violated her constitutional right to substantive due process. *See Rutherford*, 780 F.2d at 1446–47 (citing *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), *overruled on other grounds, Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). We do not decide this question because we resolve this appeal on the ground that Wood has shown sufficient facts which, if proven at trial, establish a violation of her right to personal security, a liberty interest protected by the fourteenth amendment. This does not foreclose Wood from attempting to show at trial that Ostrander's treatment of her was such that it "shocks the conscience."

The case most like our case is *White v. Rochford*, 592 F.2d 381 (7th Cir.1979), which reversed the dismissal of a section 1983 complaint. In *White,* the defendant police officers arrested a driver for drag racing on the Chicago Skyway, a busy, limited-access highway. The complaint alleged that the driver, who was uncle to the three minor children riding with him in the car, pleaded with the officers to take the children to the police station or a phone booth so that they could contact their parents. The officers refused, and instead left the children in the abandoned car on the roadside, in inclement weather. The court held that the alleged conduct stated a claim under section 1983. The officers "could not avoid knowing that, absent their assistance, the three children would be subjected to exposure to cold weather and danger from traffic. *This indifference in the face of known dangers certainly must constitute gross negligence.*" 592 F.2d at 385 (emphasis added).

In dealing with *White,* decided five years before the incident in this case, Ostrander frames the immunity issue thus:

> In determining whether Ms. Wood was subjected to a constitutional deprivation it is the state of the law on September 23, 1984, which must be used to determine whether the violation occurred.... As of September 23, 1984, no court had ruled that a police officer owed a *constitutional* duty to make transportation arrangements for a non-intoxicated adult female who was left on the sidewalk of a major urban arterial within easy walking distance of at least two 24–hour businesses following the arrest of the person with whom she had previously been riding.

Appellees' Brief at 9 (citation omitted). Ostrander seemingly suggests that this case can be disposed of if it does not bear a strict factual similarity to previous cases finding liability. However, this crabbed view of the good faith immunity principle cannot withstand analysis. As the Supreme Court recently reaffirmed, it is not the case that "an official action is protected by qualified immunity unless the very action in question has previously been held

unlawful, ... but it is to say that in light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton,* 107 S.Ct. at 3039 (citation omitted); *see Mitchell v. Forsyth,* 472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12.

The first question is whether *White* is meaningfully distinguishable from the instant case. Both cases involve a police officer's roadside abandonment of non-arrested third parties. Ostrander apparently would have the court decide that stranding three children on a busy eight-lane expressway is much worse than stranding a lone woman in a high-crime area at 2:30 a.m., indeed so much worse that the former is a constitutional violation while the latter is not. It would seem that the Supreme Court's admonition in *Anderson* against looking for a repetition of "the very action in question" applies forcefully against making this type of comparison. Although the dangers facing the victims in the two cases may come from very different sources, the degree of danger is high in both, and the alleged police indifference to exposing the plaintiffs to the dangers is apparent in both instances. Ostrander's suggestion that the children were in greater danger than Wood ("*certain danger* from the traffic and weather," Appellees' Brief at 10) is unpersuasive considering what actually occurred: none of the children was injured by a car (two suffered mental anguish, and a third suffered aggravation of his asthma condition from the weather), whereas Wood was raped.

Ostrander also argues that *White* was merely a "plurality" opinion and, further, adopted an *"in loco parentis"* rationale, finding that the officers owed a special duty to the children. This argument mischaracterizes *White.* The opinion of the court and the concurrence agree on the basic rationale of section 1983 liability: "indifference [of the officers] in the face of known dangers," 592 F.2d at 385 (opinion of court); "[u]nnecessarily endangering *the innocent parties* in reckless disregard of their safety," *id.* at 388 (concurrence) (emphasis added). The opinion of the court states that the officers could be liable un-

der section 1983 based on two theories: (1) for an "intrusion upon personal integrity" as a result of gross negligence or reckless disregard for the safety of others, or (2) for conduct which "shock[s] the conscience." *White*, 592 F.2d at 384–85 & n. 6. The *"in loco parentis"* concept was introduced only in the second half of a lengthy footnote to buttress the existence of the state's duty as it arose in the case, and not as the sole basis for such duty. *Id.* at 384 n. 6.

The immunity standard considers whether a reasonable law enforcement officer should view the *White* case as controlling. Given this element of reasonableness, the qualified immunity regime of clearly established law should not be held to allow section 1983 defendants to interpose lawyerly distinctions that defy common sense in order to distinguish away clearly established law. *White* holds that a police officer may be liable under section 1983 when he abandons passengers of arrested drivers under circumstances which expose them to unreasonable danger. It defies common sense to find a meaningful legal distinction between the dangers facing children crossing a busy highway and a woman left alone to fend for herself at 2:30 a.m. in a high-crime area.

## B. The Precedential Effect of White in This Circuit

The inquiry does not end here, however, because *White* did not necessarily establish law for this circuit. Where there are few cases on point, and none is binding, "an additional factor that may be considered in ascertaining whether the law is 'clearly established' is a determination of the likelihood that the Supreme Court or this circuit would have reached the same result" as the non-binding authorities at that time. *Capoeman*, 754 F.2d at 1515; *accord Ward*, 791 F.2d at 1332.

There was no Supreme Court case, or case in this circuit, which was binding on this circuit when the events in this case occurred. Therefore, we begin with an analysis of whether it was likely, in September 1984, that our circuit would have come to the same result the Seventh Circuit

did in *White*. In this analysis it is important to clarify the result in *White*. There were three opinions in the case. The lead opinion was written by Judge Sprecher. Judge Tone concurred in part. Judge Kilkenny of our circuit was sitting by designation and he dissented. Judges Sprecher and Tone agreed that when the police officers arrested the children's uncle and took him away, they left the children exposed to the "hazards" of "an immobilized car on a highspeed expressway and [the] cold", and that this conduct violated the children's "federally protected right to be free from unjustified intrusions on their personal security by the police." *White* at 387 (Tone, J., concurring); *compare id.* at 384–85 (Sprecher, J., lead opinion)).

*White* was decided in 1979. Four years later the Seventh Circuit decided *Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir. 1983). In *Jackson*, a car swerved off the road, crashed and burst into flames. Two minutes later a Joliet policeman arrived on the scene by chance. The car's wheels were spinning, its lights were on, its motor was running, and it was burning. The officer, however, made no attempt to determine whether it was occupied and did not call an ambulance. He did call the fire department. He then returned to the road and directed traffic away from the scene of the accident. Firemen arrived eight minutes later. They made no attempt to remove or assist the occupants of the car who were observed slumped in the front seat. The occupants died. An action was filed under section 1983 alleging that the occupants of the car could have been saved if the officer had aided them, or called an ambulance, or at least not directed traffic in a way that prevented other potential rescuers from saving them, or if the firemen had tried to aid them. The district court denied motions to dismiss for failure to state a claim. The Seventh Circuit reversed. The court stated:

We hold that an attempt by state officers to assist at an accident is not a deprivation of life without due process of law under the Fourteenth Amendment when the attempt fails because of the negligence or even gross negligence of

the officers or their superiors, and the accident victim dies.

*Id.* at 1206. The *Jackson* court distinguished its "officer-who-comes-upon-an-accident" case from *White:* "In *White v. Rochford* the arrest created the danger to the children; here the [occupants of the wrecked car] were in great danger before the [police and firemen] appeared." *Id.* at 1204. The *Jackson* court amplified its distinction of *White* as a case "where the police arrested a driver and left his child passengers stranded in a driverless car, thus putting the children in a situation of peril for the consequences of which the police were held liable under section 1983". *Id.*

Between *White* and *Jackson,* the Seventh Circuit decided *Bowers v. DeVito,* 686 F.2d 616 (7th Cir.1982). Judge Posner wrote the opinions in *Bowers* and *Jackson.* In *Jackson* he noted that *Jackson* was closer to *Bowers* than to *White.* He stated that in *Bowers* "the state officers did not create but merely failed to avert danger, by negligently releasing from custody a dangerous lunatic who then killed the plaintiff's decedent." *Jackson* at 1204–05. In *Bowers* Judge Posner noted the difference which would exist if the state placed a person in danger. He stated:

> If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Bowers,* 686 F.2d at 618.

Would we, in 1984, have followed the holding of *White,* and the logic of Judge Posner's comments in *Bowers* and *Jackson?* We believe most certainly we would have. In *Escamilla v. City of Santa Ana,* 796 F.2d 266 (9th Cir.1986) we affirmed summary judgment in favor of police officers in a section 1983 action where the police had been involved in a shootout in a barroom and a bystander had been killed by a stray bullet fired by a suspect. We distinguished the *Escamilla* case from a case in which the officers "create or exacerbate the danger," *Escamilla* at 269, and

we cited Judge Posner's language from *Bowers,* quoted above, as support for this distinction. *Id.*

We do not look to *Escamilla,* a post-incident decision, to determine whether the law was "clearly established" at the time of the incident in the present case. *Capoeman v. Reed,* 754 F.2d at 1515. We don't have to. By 1984, the law had been established by *White* and clearly articulated by *Bowers* and *Jackson.* We do consult *Escamilla* to note that it cited *Bowers* with approval and quoted Judge Posner's comments in that case. *Escamilla* also cited *Jackson.* Having found *Bowers* and *Jackson* in 1986 when we wrote *Escamilla,* we have no doubt we would have found these cases in 1984. The question is, would we have followed their reasoning, and the *White* case which *Jackson* cited?

In *Capoeman v. Reed, supra,* we affirmed summary judgment in favor of prison officials who, in 1981, cut Capoeman's hair over his objection that he wore it long for religious purposes, and in spite of his citation to supporting Eighth Circuit authority. *Capoeman,* 754 F.2d at 1513. We noted that in addition to the Eighth Circuit case cited by Capoeman, there were two other opinions from the Second Circuit, all of which were on the books at the time the officials cut Capoeman's hair and all of which supported his position. We refused to follow these cases. We did not have a case in our circuit on point. We stated that "[t]o make the determination [of the likelihood the Supreme Court or this circuit would have reached the same result as the cases which supported Capoeman], we examine the legal analysis employed by ... courts [which had considered the issue] and compare it to the analysis being used at that time by the Ninth Circuit in related but factually different situations." *Id.* at 1515. We then noted that various courts had "applied a number of different legal standards to prisoner claims of infringement of free exercise rights." *Id.* We cited a law review article which identified "at least seven different standards for analyzing prisoner free exercise claims." *Id.* Capoeman contended that instead of cutting his hair, the prison officials should

have tied it back to take the picture they claimed they needed to identify him wearing short hair. He thus asserted a "least restrictive means" for the prison to accomplish its purpose of prisoner identification. We noted that outside of our circuit there was a "wide diversity" in standards which had been applied by various courts of appeals in considering how to deal with such prisoner claims. *Id.* Within our circuit we cited *Jones v. Bradley,* 590 F.2d 294 (9th Cir.1979), in which an inmate challenged the prison's denial of the use of the prison chapel. We commented that in *Jones* our circuit had "concluded that the state had a legitimate interest in placing *appropriate restrictions* on chapel use that were reasonable to maintain order and security," (emphasis added), and that we had given "no indication that 'appropriate restrictions' meant the least restrictive means" for which Capoeman contended. *Id.* at 1515–16. In view of what appeared to be conflicting authority from other circuits, as well as case law from our circuit which cut against Capoeman's claim, we concluded that the law had not been so clearly established that the prison officials were not entitled to qualified immunity. *Id.* at 1516.

At the time of the incident in the present case, the Seventh Circuit cases previously noted had been decided. These cases support Wood's position. At the time of the incident in this case, no other case had rejected a section 1983 claim such as Wood's. There was no "wide diversity" of cases which had considered such claims and which had arrived at differing results. *Cf. Capoeman,* 754 F.2d at 1515. And there was nothing in our circuit to indicate that we would have decided this case differently from *White* or that we would have rejected Judge Posner's analysis in *Bowers* and *Jackson. Cf. Capoeman* at 1515–16 discussing *Jones v. Bradley,* 590 F.2d 294. We conclude that it was clearly established by September 1984 that Ostrander's alleged treatment of Wood violated her liberty interest in personal security under the fourteenth amendment. We next consider the question whether Ostrander, as a reasonable police officer, should have known of this clearly established constitutional

right. *See Anderson v. Creighton,* 107 S.Ct. at 3039; *Vaughan v. Ricketts,* 859 F.2d at 739.

The answer to this question is compelled by *Ward v. County of San Diego,* 791 F.2d at 1332. There we stated:

... [*Capoeman*] places the responsibility for keeping abreast of constitutional developments in criminal law squarely on the shoulders of law enforcement officials. Given the power of such officials over our liberty, and sometimes even over our lives, this placement of responsibility is entirely proper. Law enforcement officials must be cognizant not only of how far their authority extends, but also of the point at which their authority ends. At the same time, however, we do not read [*Capoeman*] to require of most government officials the kind of legal scholarship normally associated with law professors and academicians. A reasonable person standard adheres at all times.

*Id. Ward* was decided in 1986. It considered a strip search at a San Diego County jail facility which had occurred in 1981. We noted in *Ward* that by 1984 we had decided *Giles v. Ackerman,* 746 F.2d 614 (9th Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985) in which "we established that strip searches of arrestees for a minor offense are unconstitutional absent individualized suspicion that such arrestee is carrying or concealing contraband or is suffering from a communicable disease." *Ward,* 791 F.2d at 1333. Obviously the jail officials in *Ward* were not aware of the 1984 *Giles* decision when they strip searched the plaintiff in 1981. But we stated in *Ward* that "[p]re–1981 strip search cases, including *Tinetti,* harbinged our decision in *Giles....*" *Ward* at 1333, referring to *Tinetti v. Wittke,* 479 F.Supp. 486, 490–91 (E.D. Wis.1979), *aff'd,* 620 F.2d 160 (7th Cir.1980). The same is true here. Pre–1984 cases, including *White,* harbinged our decision in this case.

We conclude that if Wood establishes at trial the facts which she has stated in support of her section 1983 action, and which we must accept as true at this stage of the

case, Ostrander will not be entitled to qualified immunity. A reasonable police officer who acted as Wood alleges Ostrander acted should have understood that what he was doing violated Wood's constitutional right to be free from an unjustified intrusion into her personal security in violation of her liberty interest under the fourteenth amendment. *See Anderson v. Creighton,* 107 S.Ct. at 3039; *White v. Rochford,* 592 F.2d at 384–85 & 387 (Tone, J., concurring).

## CONCLUSION

In sum, Wood has raised a genuine factual dispute regarding whether Ostrander deprived her of a liberty interest protected by the Constitution by affirmatively placing her in danger and then abandoning her. If Ostrander acted as Wood claims he did, Ostrander is not entitled to the defense of qualified immunity. Accordingly, the grant of summary judgment in favor of the defendant Ostrander is reversed. We also reverse the summary judgment in favor of Mrs. Ostrander, for the reasons stated in footnote 1, *supra.* The summary judgment in favor of Neil Maloney and his wife is affirmed.

**AFFIRMED IN PART, REVERSED IN PART,** and **REMANDED** to the district court for further proceedings consistent with this opinion.

CARROLL, District Judge, dissenting:

I disagree with the amended opinion issued following rehearing. The reasons expressed in my prior dissent remain as stated in *Wood v. Ostrander,* 851 F.2d 1212, 1220 (9th Cir.1988) and as supplemented by further review of the qualified immunity issue. Additional concerns are prompted by two opinions of the United States Supreme Court issued since this matter was reargued on November 23, 1988, *DeShaney v. Winnebago Cty. Soc. Servs. Dept.,* —— U.S. ——, 109 S.Ct. 998, 103 L.Ed.2d 249

(1989) and *Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

The basic (initial) issue to be addressed in this case is whether Ostrander arguably violated Wood's liberty rights under the substantive component of the Due Process Clause. The majority opinion concludes as a matter of law that:

> The fact that Ostrander arrested Bell, impounded his car, and apparently stranded Wood in a high-crime area at 2:30 a.m. distinguishes Wood from the general public and triggers a duty of the police to afford her some measure of peace and safety. *See White v. Rochford,* 592 F.2d at 384 and n. 6 (and authorities cited therein). See also *Chambers–Castenes v. King Co.,* 100 Wash.2d 275, 669 P.2d 451 (1983); ... (policy of state to respond to requests for assistance in courteous and judicious manner).[1]

Ergo, the majority opinion concludes, "We are satisfied that Wood has presented genuine issues of material fact on the question of whether Ostrander deprived her of a liberty interest protected by the Constitution. *See Ingraham v. Wright, supra: Haygood v. Younger,* 769 F.2d at 1356." I do not agree with this conclusion for the reasons stated in this dissent.

The first of two other issues, assuming the Due Process Clause required the State to protect Wood from her unknown assailant, concerns whether Ostrander has the requisite state of mind to make out a due process violation. The amended opinion concludes—post *Canton*—that "Wood has raised a genuine issue of fact tending to show that Trooper Ostrander acted with deliberate indifference to Wood's interest in personal security under the fourteenth amendment." Citing *Taylor v. Ledbetter,* 818 F.2d 791, 793 (11th Cir.1987) (en banc).

Certiorari has been granted in *Taylor,* the case has been argued and an opinion can issue at any time.[2] While I agree that

---

1. I do not understand the relevance of this State Court opinion to issues in this appeal. The fact that the State of Washington has a policy that police officers should give assistance, etc., to motorists and their passengers would not make violation of that policy a section 1983 violation;

neither would it serve to impose liability on the state for its failure to properly train state troopers to effectuate that policy.

2. The Supreme Court's decision in *Taylor* may further refine the "special relationship" situations to include children "involuntarily placed

"deliberate indifference" is the appropriate standard, I believe that the *record*, construed in a manner most favorable to Wood, does not "tend[ ] to show a disregard for Wood's safety amounting to deliberate indifference."

The last issue is whether Ostrander is entitled to a qualified immunity defense. Again, the majority opinion concludes, after a studied analysis:

[T]hat if Wood establishes at trial the facts she has stated in support of her section 1983 action, and which we must accept as true at this stage of the case, Ostrander will not be entitled to qualified immunity. A reasonable police officer who acted as Wood alleges Ostrander acted should have understood that what he was doing violated Wood's constitutional right to be free from an unjustified intrusion into her personal security in violation of her liberty interest under the fourteenth amendment. See *Anderson v. Creighton*, 107 S.Ct., at 3039; *White v. Rochford*, 592 F.2d, at 384–85 & 387 (Tone, J., concurring).

For reasons detailed in this dissent, I do not agree that *White v. Rochford*, 592 F.2d 381 (7th Cir.1979) was "clearly established" law in 1984 with reference to the substantive due process issue in this case. I do not believe that *White* is precedential authority post *DeShaney*, for the proposition that Ostrander "acted with deliberate indifference to Wood's interest in personal security under the fourteenth amendment."

## DISCUSSION

I. *Criteria for a Section 1983 Claim under the Substantive Component of the Fourteenth Amendment's Due Process Clause*

I respectfully submit that *DeShaney* is now the controlling authority to determine what are the relevant criteria for determining whether a section 1983 claim is stated under the substantive component of the Fourteenth Amendment's Due Process Clause.

*DeShaney*, like the case at hand, involved the "substantive rather than the procedural component of the due process clause":

Joshua [DeShaney] and his mother brought this action under 42 U.S.C. § 1983 in the United States District Court for the Eastern District of Wisconsin against respondents Winnebago County, its Department of Social Services, and various employees of the Department. The complaint alleged that respondents had deprived Joshua of his liberty without due process of law, in violation of his rights under the Fourteenth Amendment, by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known.

109 S.Ct., at 1002.

The Supreme Court explained that it granted certiorari in *DeShaney:*

Because of the inconsistent approaches taken by the lower courts in determining when, if ever, the failure of a state or local governmental entity or its agents to provide an individual with adequate protective services constitutes a violation of the individual's due process rights, see *Archie v. City of Racine*, 847 F.2d 1211, 1220–1223, and n. 10 (CA 7 1988) (en banc) (collecting cases), cert. pending, No. 88–576, and the importance of the issue to the administration of state and local governments, . . . .

*Id.,* at 1002.

The Supreme Court first outlined why it is that a state is not "categorically obligated" to protect a person from private violence:

But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as

---

in a foster home" as being "analogous to a prisoner in a penal institution and a child confined in a mental health facility." 818 F.2d at 797. This is a far different situation than ex-

tending protection of Fourteenth Amendment rights to adult passengers in a vehicle where the driver is arrested.

a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text. Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power or employing it as an instrument of oppression'.... Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.

Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual. [citations omitted] ... If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. [footnote omitted]. As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

109 S.Ct., at 1003–04.

The Court went on to discuss Petitioners' contention that a "duty" to provide "adequate protective services" arises out of " 'special relationships' created or assumed by the State with respect to particular individuals." Petitioners argued that such a "special relationship" existed in *DeShaney* "because the State knew that Joshua faced a special danger of abuse at his father's

hands, and specifically proclaimed by word and by deed its intention to protect him against that danger." Petitioners then argued that "Its [the State's] failure to discharge that duty, ... was an abuse of governmental power, that so 'shocks the conscience', *Rochin v. California,* 342 U.S. 165, 172 [72 S.Ct. 205, 209, 96 L.Ed. 183] (1952), as to constitute a substantive due process violation."

The Opinion observes (n. 4) that "The genesis of this notion [a special relationship] appears to lie in a statement in our opinion in *Martinez v. California,* 444 U.S. 277 [100 S.Ct. 553, 62 L.Ed.2d 481] (1980). In that case, we were asked to decide, *inter alia,* whether state officials could be held liable under the Due Process Clause of the Fourteenth Amendment for the death of a private citizen at the hands of a parolee. Rather than squarely confronting the question presented here—whether the Due Process Clause imposed upon the State an affirmative duty to protect—we affirmed the dismissal of the claim on the narrower ground that the causal connection between the state officials' decision to release the parolee from prison and the murder was too attenuated to establish a 'deprivation' of constitutional rights within the meaning of § 1983."

In this same footnote (n. 4) the Court commented that several Courts of Appeal have read the statement in *Martinez:*

> [T]he parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger. We need not and do not decide that a parole officer could never be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole.

"as implying that once the State learns that a third party poses a special danger to an identified victim and indicates its willingness to protect the victim against danger, a 'special relationship' arises between State and victim, giving rise to an affirmative duty, enforceable through the Due Process Clause, to render adequate protection." The *DeShaney* opinion makes it

clear that this construction of *Martinez* is overbroad.

The Supreme Court flatly rejected petitioners arguments in *DeShaney* and impliedly the Circuit Court opinions relying on similar arguments. (*Balistreri v. Pacifica Police Dept.*, 855 F.2d 1421, 1425–26 (CA9 1988), (a special relationship case), was one of the Circuit Court opinions referenced in this regard). The Supreme Court cited its prior opinions to illustrate why it is "that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals," i.e., "adequate medical care to incarcerated prisoners;" services to "involuntarily committed mental patients ... as are necessary to ensure their 'reasonable safety' from themselves and others," and "medical care to suspects in police custody who have been injured while being apprehended by the police." The Court then noted:

> But these cases afford petitioners no help. Taken together, they stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume responsibility for his safety and general well-being.

109 S.Ct., at 1005. The Court goes on to hold:

> The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. [Citation omitted]. In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harm inflicted by other means.

*Id.*, 109 S.Ct. at 1006.

After its discussion of *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and *Youngberg v. Romeo*, 457 U.S.

307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the *DeShaney* Court said:

> The *Estelle-Youngberg* analysis simply has no applicability in the present case. Petitioners concede that the harms Joshua suffered did not occur while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. [footnote omitted]. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

*Id.*

Here, Wood was never in the State's custody. The person from whom Wood accepted a ride and who allegedly raped her was not a state actor. Assuming the State was aware of the speculative dangers that Wood faced or of any of her alleged circumstances concerning money, or the inability to call anyone to pick her up, or the distance she had to walk, the State played no part in their creation. Neither did the State render her more vulnerable than any other member of the general public in that area, whether walking about, standing by the side of the road, or going to or from one of the nearby 24–hour business establishments.

The State patently did not become the guarantor of Wood's safety when it arrested the drunken driver of the car in which she was riding. How could any reasonable police officer be aware that in not escorting Wood home, or taking her to a location she requested, he was violating her "constitutional right to be free from an unjustified intrusion into her personal security in violation of her liberty interest under the four-

teenth amendment." This proposition is the most attenuated of claimed "special relationships," and cannot pass constitutional muster. Consistent with *DeShaney*, the State owed no constitutional duty to Wood.

The Amended Opinion continues to rely on *White v. Rochford*, 592 F.2d 381, 385 (7th Cir.1979), after *DeShaney*. Thus *White* is cited for the proposition that "gross negligence or reckless disregard for the safety of others" is cognizable under section 1983; as well as supporting the majority's conclusion "that Ostrander having arrested Bell, impounded his car, and apparently stranded Wood in a high-crime area at 2:30 a.m. distinguishes Wood from the general public and triggers a duty of the police to afford her some measure of peace and safety." This latter proposition—a special relationship contention—is totally inconsistent with the legal principles enunciated so clearly in *DeShaney*.

Justice Brennan recognizes that the majority opinion in *DeShaney* is contrary to *White*.[3] Thus, he states in his dissent:

Cases from the lower courts also recognize that a State's actions can be decisive in assessing the constitutional significance of inaction. For these purposes, moreover, actual physical restraint is not the only State action that has been considered relevant. See, e.g., *White v. Rochford*, 592 F.2d 381 (CA7 1979) (police officers violated due process when, after arresting the guardian of three young children, they abandoned the children on a busy stretch of highway at night).

106 S.Ct., at 1008.

The Amended Opinion's *only* reference to *DeShaney* is as follows:

Wood has raised a triable issue of fact as to whether Ostrander's conduct 'affirmatively placed the plaintiff in a position of danger.' *Ketchum*, 811 F.2d at 1247; See *Jackson v. City of Joliet*, 715 F.2d at 1204 (distinguishing situation where arrest creates the danger, actionable under section 1983, from situation where danger existed before defendant acted); see also *DeShaney v. Winnebago Cty. Soc. Servs. Dept.*, —— U.S. ——, 109 S.Ct. 998, 1006 [103 L.Ed.2d 249] (1989), distinguishing situation where state 'played no part' in creating the dangers that minor child faced by remaining in his father's custody 'nor did [the state] do anything to render [the child] any more vulnerable to them').

The limited quotes from *DeShaney* were not decisive to that opinion. This is readily apparent when it is recalled that the State had in fact taken custody of the child and thereafter "returned him to his father's custody," while having knowledge of the father's abusive character. Nonetheless, the Supreme Court found that these circumstances were not "sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." 109 S.Ct., at 1006, n. 9.

To repeat, the State did not create the unknown dangers, whatever they were, that Wood faced when she decided to accept a ride from a stranger rather than choose one of the other options that were available to her.[4]

The statement in the Amended Opinion, n. 6, that it "does not foreclose Wood from attempting to show at trial [as a violation of a constitutional right to substantive due process] that Ostrander's treatment of her was such that it 'shocks the conscience,'" appears to offend the plain holding of *DeShaney*, wherein it rejected a similar argument. See also Comment, *Substantive Due Process Analyses of Non-legislative State Action, A Case Study*, 1980 Brig.Yg. L.Rev. 347. In discussing *White v. Rochford*,—the case under study—the writer anticipated *DeShaney* when he concludes:

*Rochin* was not a substantive due process case at all. Its rationale and holding dealt strictly with the procedural guarantees of the due process clause;

---

**3.** Justice Brennan also cited *White* in his dissenting opinion (n. 3) in *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 674, 88 L.Ed.2d 677 (1986).

**4.** The area where Wood's companion was arrested is a well-lighted thoroughfare in a commercial district. Two retail businesses in the immediate vicinity were open and lighted.

'shocks the conscience' test to which the Rochin decision gave birth had nothing whatsoever to do with defining an independent and absolute right, as the Court in *White* apparently assumed. The liberty interest at stake in *Rochin* was liberty in its classical sense. It was an interest in freedom from physical restraint, a freedom deprived in that case as a result of criminal conviction and incarceration. The *Rochin* opinion was simply addressed to the question of whether the conviction was obtained by methods satisfying 'due process of law.'

*Id.*, at 369.

## II. *The Requisite—"State of Mind" to make out a Due Process Violation*

The amended opinion asserts in an arguendo fashion that if "reckless or gross negligence" is not sufficient to state a section 1983 claim—as concluded in the original opinion, based on dictum in *Ketchum v. County of Alameda*, 811 F.2d 1243 (9th Cir.1987)—then "Wood has raised a genuine issue of fact tending to show that Trooper Ostrander acted with deliberate indifference to Wood's interest in personal security under the fourteenth amendment." The opinion does not explicate how it is that the character of Wood's version of the case has changed after rehearing from "reckless or gross negligence" to "deliberate indifference."

## III. *Qualified Immunity*

I believe it is unnecessary to consider whether Ostrander is entitled to a qualified immunity defense, given that the Due Process Claim does not require the State to protect Wood from her unknown assailant. *DeShaney, Id.*

Assuming for discussion purposes that *DeShaney* does not moot this issue, I would affirm the District Court's determination that a "special relationship" was not created in a constitutional sense between the State and Ms. Wood under the circumstances present during the early morning hours of September 23, 1984, and the District Court's further conclusion that Ostrander was entitled to qualified immunity:

Wood was an adult female, admittedly able to exercise the independent judgment of an ordinary adult. She was left within walking distance of two open businesses where she could seek help. In this case the State had not affirmatively committed itself to protecting this class of persons. The state at the time of the indictment had no guidelines requiring the safekeeping of passengers of arrestees. In this case, it cannot be said that the state knew of Wood's plight. This is not the type of case where the state had knowledge of a particular madman who was likely to prey on Wood. The plaintiff alleges that this particular area is a high-crime area. To hold that the trooper had a duty of protection on that basis would be to create an affirmative constitutional duty of protection, in essence, to the public as a whole. This court declines to do so. Ostrander was unaware of whether or not she had money available to seek help. Thus, even assuming that an officer in 1984, through some crystal ball analysis, could foresee the analytical approach suggested by the Ninth Circuit in 1986, a special relationship was not created. At the time of the incident Ostrander's conduct did not violate a clearly established constitutional right. Ostrander is entitled to qualified immunity from suit for civil damages. (ER 54, p. 9).

The standard of qualified immunity outlined in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), entitles a public official to immunity so long as his actions do not violate a clearly established statutory or constitutional right about which a *reasonable person* would have known.

This defense is a matter of consequence to public officials at every level of government. It allows them to exercise their discretion in situations where claimed rights have not been clearly established, and to act "with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967).

**602**

Qualified immunity is an entitlement not to stand trial under certain circumstances or to be burdened with broad reaching and costly pretrial discovery. *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985):

> "The entitlement is an *immunity* from *suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." 472 U.S. at 526, 105 S.Ct. at 2815.

Resolution of this issue is encouraged on summary judgment; a denial of the defense, to the extent it turns on an issue of law, is a final decision which may be reviewed by way of an interlocutory appeal. *Id.*, at 530, 105 S.Ct. at 2817. Qualified immunity is a fact specific determination.

This "important question" was revisited in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). In *Anderson* the Court of Appeals for the Eighth Circuit had determined that a police officer was not entitled to summary judgment on qualified immunity grounds, "since the right [he] was alleged to have violated—the right of persons to be protected from warrantless searches of their homes unless the searching officers have probable cause and there are exigent circumstances—was clearly established." *Id.*

Justice Scalia, writing for the majority in *Anderson*, after giving an overview of the breadth of the qualified immunity defense, e.g., it "protects 'all but the plainly incompetent or those who knowingly violate the law,'" concluded:

> Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action. *Harlow*, 457 U.S., at 819, 102 S.Ct., at 2739, assessed in light of the legal rules that were 'clearly established' at the time it was taken, *id.*, at 818, 102 S.Ct., at 2738.

107 S.Ct., at 3038.

*Anderson* goes on to explain why the claimed violation of a broad general constitutional principle is not the kind of "clearly established law" upon which a damage claim can rest:

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy 'the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties,' by making it impossible for officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages.' *Davis*, 468 U.S., at 195, 104 S.Ct., at 3019. [footnote omitted]. It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell*, 472 U.S., at 535, n. 12, 105 S.Ct. at 2820, n. 12; but it is to say that in the light of preexisting law the unlawfulness must

be apparent. See, e.g., *Malley, supra,* 475 U.S. [335], at 344–345, 106 S.Ct. [1092], at [1098] [89 L.Ed.2d 271]; *Mitchell, supra,* 472 U.S., at 528, 105 S.Ct., at 2816; *Davis, supra,* 468 U.S., at 191, 195, 104 S.Ct., at 3017, 1019.

*Id.,* at 3038–39.

In *Ward v. County of San Diego,* 791 F.2d 1329 (9th Cir.1986), this Court discussed the qualified immunity defense and its application under *Harlow* and *Capoeman v. Reed,* 754 F.2d 1512 (9th Cir.1985):

> We first note that *Capoeman* places the responsibility for keeping abreast of constitutional developments in criminal law squarely on the shoulders of law enforcement officials. Given the power of such officials over our liberty, and sometimes even over our lives, this placement of responsibility is entirely proper. Law enforcement officials must be cognizant not only of how far their authority extends, but also of the point at which their authority ends. At the same time, however, we do not read *Capoeman* to require of most government officials the kind of legal scholarship normally associated with law professors and academicians. A reasonable person standard adheres at all times.

791 F.2d, at 1332.

On September 23, 1984, *White v. Rochford,* 592 F.2d 381 (7th Cir.1979), was the one and only case in all American jurisprudence holding—even inferentially—that an arresting officer owed a duty to passengers (children) in a car "to conduct an arrest in such a manner that the children's interest in personal security was not infringed." (concurring opinion, *Id.* at 388).

The first question to be answered is what legal rules were expressed in *White* and were they "clearly established" by that opinion so that a reasonable police officer would understand that the " 'law clearly proscribed the actions' " he took. *Anderson,* 107 S.Ct. at 3038.

The majority opinion admonishes here that:

The immunity standard considers whether a reasonable law enforcement officer should view the *White* case as controlling. Given this element of reasonableness, the qualified immunity regime of clearly established law should not be held to allow section 1983 defendants to interpose lawyerly distinctions that defy common sense in order to distinguish away clearly established law ...

One is left to wonder who—if not the lawyers—will speak for these reasonable police officers in attempting to persuade a court whether a proposition is or is not clearly established law.

In the final analysis, *White* must be considered in its totality, as it might be understood by a reasonable police officer, and not, I submit, as the majority opinion has done, by excerpting seven words from the one judge lead opinion in *White* by Judge Sprecher and eleven words from the partially concurring opinion of Judge Tone ("I agree in part, but not in all respects, with Judge Sprecher's reasons for reversal of the judgment as to the police officer defendants, and am therefore stating separately my reasons for concurring in that action." *Id.,* at 386). Consideration is also required of Judge Kilkenny's dissenting opinion ("The majority, by implication, imagination, or otherwise paints a picture which finds no support in the record. The cases do not fit our facts." *Id.,* at 392). It is evident that there are a variety of judgments that a reasonable police officer could reach after reviewing these three opinions.

The fact that the majority here believe that "It defies common sense to find a meaningful legal distinction between dangers facing children crossing a busy highway and a woman left alone to fend for herself at 2:30 a.m. in a high crime area," does not require that a reasonable police officer would have so concluded after reading *White*—he might well be uncertain whether the rationale of the lead and concurring opinions extended only to children passengers, or to any passengers.[5]

---

**5.** I do not agree that *White* was correctly decided on a constitutional basis. I believe, however, that there are meaningful legal distinctions be-

tween duties which law enforcement officers may owe to minor children and an adult when they arrest the driver of a car in which they are

Judge Sprecher's opinion was obviously prompted by the fact that the passengers were minor children who had been deprived of the adult protection of their custodian. It would unduly extend this dissent to incorporate Judge Sprecher's extensive statements in this regard, or to include his references to state statutes concerning duties owed minor children by persons responsible for their custody. Suffice it to say that his statement of the issue presented on appeal illustrates what his concerns were:

The issue presented by this case is whether police officers may, with constitutional impunity, abandon children and leave them in health-endangering situations after having arrested their custodian and thereby deprived them of adult protection. We hold that they may not, and accordingly, we reverse the district court's dismissal of a complaint alleging such facts and remand for trial.

592 F.2d, at 382.

Although Judge Tone did not concur in all respects with Judge Sprecher's reasons for reversal, his concurring opinion could justifiably cause a reasonable police officer to believe that the minor children's custodial status was a controlling principle in the case:

In the case at bar the children in the car had a federally protected right to be free from the unjustified intrusions on their personal security by the police. Their personal security was under the protection of their uncle. If that protection was removed and no alternative protection was provided, they would be exposed to danger as occupants of an immobilized car on a highspeed expressway and to the cold. Arresting the uncle and thus removing their protection, and yet leaving the children exposed to these hazards, was an unjustified intrusion on the children's personal security.

*Id.*, at 387.

Just as the police officers are not held to the standards of legal scholars, neither should they be expected to analyze and parse an opinion (that they never heard of) utilizing the legal skills and reasoning of an appellate judge.

The opinions that cited *White* prior to September 1984, either distinguished the case from the one being decided (*Williams v. City of Boston*, 599 F.Supp. 363, 367 (D.Mass.1984)) (No liability for a student injured at a football game scheduled in a high crime area. The Court held the plaintiff "was no more foreseeable victim of harm than any other person in attendance at the football game ... Furthermore, as in *Martinez*, the causal connection between the defendants' acts and the plaintiff's injury is too tenuous to impose § 1983 liability."); cited it for the proposition that gross or reckless conduct in a situation that would otherwise be simple negligence was sufficient to state a § 1983 claim, (e.g., *Means v. City of Chicago*, 535 F.Supp. 455 (N.D.Ill.1982)); or that mental or emotional distress may be compensable under § 1983, (*James v. Bd. of Sch. Com'rs of Mobile County, Ala.*, 484 F.Supp. 705, 714 (S.D. Ala.1979). *See also* other cites: *Coyne v. Boeckmann*, 511 F.Supp. 667, 669 (E.D. Wis.1981) (coerced confession from a 17 yr. old); *Seide v. Prevost*, 536 F.Supp. 1121, 1125 (S.D.N.Y.1982) (state responsibility for committed and uncommitted disturbed persons); *Larson v. Wind*, 536 F.Supp. 108 (N.D.Ill.1982) (medical assistance for person in police custody); *Arko v. Broom*, 518 F.Supp. 669 (D.Colo.1981) (police officers exposed to dangerous or addictive drugs); *Wedgeworth v. Harris*, 592 F.Supp. 155 (W.D.Wis.1984) (sexual assault by a police officer).

At best, *White* is a "special relationship" case—dealing with a police officer and minor children in an unusual situation. The Seventh Circuit recognized that fact in *Ellsworth v. City of Racine*, 774 F.2d 182, 195 (7th Cir.1985), when it noted:

"Indeed, we have held that: the constitution creates a duty on the part of police officers to protect minor children from

---

riding. I also believe that the dangers facing the minor children in *White* were immediate and apparent, whereas any dangers facing Wood were speculative, conjectural and subject to her control. The injury which she claims to have suffered could have occurred to any woman accepting a ride from a stranger at any hour of the day in any community.

immediate hazards after police officers arrest the children's guardians. *White v. Rochford,...."*

One further statement in *Ellsworth* is pertinent:

"The contours of what constitutes a 'special relationship' between a municipality, acting through its officials, and its citizens are hazy and indistinct. We have tried to lend clarity to the concept when faced with the facts presented by individual cases." *Id.,* at 185.

That is what occurred in *White* when the Court considered the facts presented in that individual case. Could anyone fairly conclude that the *White* court would have found the same "constitutional" violation if Ms. Wood had been the passenger left sitting in the car on the Chicago Skyway, rather than the minor children? I submit not.

*The Precedential Effect of White in this Circuit*

In light of the conclusions I reach regarding *DeShaney* and the fact that *White* does not identify a "clearly established" constitutional right allegedly violated by Ostrander, it is not necessary to address the majority opinion's conclusion that "it was likely in September, 1984 the Ninth Circuit would have come to the same result as the Seventh Circuit did in *White.*"

I do not understand, however, how the majority opinion reaches this conclusion without addressing the concerns expressed by Judge Kilkenny in his dissent. (592 F.2d, at 388–395). I say this not because Judge Kilkenny is a long time Ninth Circuit Judge, but rather because of his thoughtful critique of the other two opinions, as well as his analysis of opinions relied on by Judges Sprecher and Tone:

"The authorities cited by appellants are wide of the mark. In no way do they support appellants' principal claims that they were deprived of their constitutional rights to liberty, non-interference with family affairs or freedom to travel in interstate commerce." *Id.,* at 397.

With respect to the "liberty" interest issue, Judge Kilkenny observed:

The majority, by implication, imagination, or otherwise paints a portrait which finds no support in the record. The cases cited do not fit our facts. These cases involve state or governmental agency action directed at a particular person whom the agency or officer has either taken into custody or over whom they have asserted responsibility. Nowhere does the majority face up to the distinction which I make as to the duty owed to the uncle, once arrested, and the absence of duty to the children against whom no action was taken.

*Id.,* at 392.

Judge Kilkenny also foresaw the *DeShaney* holding when he said "[n]o authority is cited by either member of the majority which would place the actions of the officers in the instant case in violation of the second aspect of the Due Process Clause's protection, i.e., that their action 'shocks the conscience.' This is just a wishful way of attempting to create a constitutional remedy where none exists." *Id.,* at 393.

Under *Capoeman* this court would have considered the law review comment in 1980 Brig.Yg.L.Rev. 347, referenced earlier in my dissent. The Comment's conclusion, captioned "A Constitutional Misstep," is particularly insightful:

In *White v. Rochford,* the Seventh Circuit's conclusion that the offending policeman had deprived the plaintiff children of constitutional rights seem to follow emotional impulses more closely than it follows acceptable principles of due process analysis. The court gave only incomplete reference to appropriate case law, it refused to consider even the relevance of procedural questions, and it failed to note the special relevance that the recent Supreme Court decision in *Ingraham v. Wright* gave to the availability of independent causes of action under Illinois law. In so doing, the court successfully, even if perhaps not purposefully, avoided the balancing that has been commonly used to resolve due process conflicts between nonlegislative state action and constitutionally protect-

ed, but less than fundamental, personal interests.

The *White* decision's uniquely substantive approach to the due process issue evidences only an attempt to arrive at a 'just' result based on the appellate court's independent evaluation of the officers' alleged actions. The final judicial product is one that is blatantly inconsistent with evident Supreme Court policy that the due process clause is not a valid source of general federal tort liability. If the Seventh Circuit had good reasons to circumvent this policy, it could have masked its efforts more effectively. The holding in *White* could have been at least more clearly reasoned, even if not more solidly based, had it been decided on grounds of procedural insufficiency in the police officers' actions.

Substantive due process analysis has not disappeared from judicial decision making, but the trend, which should continue, has been to carefully limit its scope. Courts that are inclined to adopt a purely substantive approach toward nonregulatory types of state action similar to that challenged in *White* should first insure that the rights involved are within the scope of 'fundamentals' that find solid root in specific constitutional language or values. The Seventh Circuit's failure to do so in *White v. Rochford* resulted in an obviously superficial analysis, wanting for necessary procedural considerations and balance.

1980 Brig.Yg.L.Rev., at 374–75.

In deciding whether this circuit would have followed *White* in 1984, one must look at opinions of the United States Supreme Court as they exist today. I know of no case that holds a state official liable for conduct violative of the constitution when it occurred but no longer violative at the time the decision is being made. *White*, whatever its status in 1984, does not survive *DeShaney* as precedential authority for a claimed special relationship duty.

Otherwise, I will leave for others to ultimately decide whether the majority correctly concludes that *White* was "clearly established" law and that it would have been followed in this Circuit in 1984. I suggest to the contrary on each proposition. *Capoeman* took a cautious view in a situation where several circuits had issued opinions on the point at issue—and appropriately found that there was uncertainty as to what would have been done in the Ninth Circuit. To take a contrary position on the basis of one opinion—and particularly of the uncertainty of *White*—would effectively void the qualified immunity defense for public officials and it would become but a barmecidal doctrine. Not only would a public official in the Ninth Circuit be charged with knowledge of Ninth Circuit precedent, but would be charged with knowledge of cases cited in opinions which were cited in Ninth Circuit opinions.[6]

## Conclusion

The State of Washington holds its police officers responsible for actions of the type alleged in this case. It was appropriate for the state to make that decision. State tort law is the arena within which to develop the procedures an officer should follow in deciding whether to offer assistance to a passenger and how that assistance should then be provided. It requires little prescience to anticipate the kind of disputes that will be generated in these instances concerning what was told the officer; mode of dress; weather forecasts; the crime rate at the arrest scene and environs; where the passenger wanted to be transported, etc. Like *DeShaney* and *White* (Judge Kilkenny's dissent), officers will undoubtedly be faced with charges of false arrest, sexual harassment and assaults as they attempt to meet whatever burdens are imposed on them in the absence of state regulations spelling out procedures to be followed. Those are not problems to be addressed

---

6. *White* was first cited in this Circuit in *Balistreri v. Pacifica Police Dept.*, 855 F.2d 1421 (9th Cir.1988) (submitted without argument on March 16, 1988 and the opinion issued August 23, 1988). Interestingly, *Balistreri* does not cite *Wood*, which was originally decided July 13, 1988.