Katherine SEWELL, by next friends
Sterling and Judy SEWELL,
Plaintiff,

v.

VAN BUREN TOWNSHIP POLICE DEPARTMENT, Police Officer Raford Judy, and Police Officer Keith Smyth, Defendants.

Civ. A. No. 91–75412.

United States District Court,
E.D. Michigan, S.D.

Nov. 30, 1992.

Patrick J. Bruetsch, Detroit, Mich., for plaintiff.

Suzanne P. Bartos, Cummings McClorey, Livonia, Mich., for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

This lawsuit was removed to this court from Wayne County Circuit Court on October 18, 1991. The court remanded all state law claims in its November 12, 1991 order. Defendants filed the instant motion for summary judgment June 18, 1992; plaintiff filed a response July 21, 1992; and defendants filed a reply July 27, 1992. Oral argument was heard August 14, 1992. At that time the parties agreed to extend discovery to October 15, 1992; and plaintiff was given until October 29, 1992, to file supplemental materials. Plaintiff filed a supplemental brief October 29, 1992, which included an affidavit by Joseph R. Davies, former chief of police for Van Buren Township.

## BACKGROUND FACTS

As in any motion for summary judgment, the facts are viewed in a light most favorable to the nonmovant. Thus, this statement of facts is taken primarily from plaintiff's response brief.

At approximately 11:15 p.m. on Sunday, September 10, 1989, Mr. Dan Russell, general manager of the Belleville Red Roof Inn located on the service drive of Interstate 94, was performing routine night rounds through the premises' parking lot when he observed a young woman alone in the dark and acting strangely. He called the Van Buren Police Department, which dispatched defendant Judy and his partner Youmans to investigate the "suspicious person." After talking with Mr. Russell, defendant Judy and Youmans approached the rear of the parking lot, where they observed plaintiff standing alone. During questioning, plaintiff told the officers that she was the wife of rock star Jon BonJovi and that she needed a room for the night. One of several names by which she identified herself to the officers was Dorthea Marks, which is the name of BonJovi's wife. Despite her use of various names, plaintiff remained consistent in her delusion of being BonJovi's wife.

While police were questioning her, plaintiff suddenly hollered and ran from them. They chased her along the freeway entrance ramp. She continued walking, oblivious to their attempts to stop her. The officers finally blocked her path by pulling the patrol car in front of her. The officers arrested her and transported her to the Van Buren Township police station.

Plaintiff contends that while she was in custody she gave defendants her family's correct address and telephone number. According to defendants, several attempts were made to contact the family by telephone, but no one answered. However, plaintiff's father has submitted an affidavit which attests that he was home during the

pertinent time frame, and the telephone never rang.

During the time plaintiff was in custody, defendants did not check her for drugs or alcohol. Plaintiff had no purse, no identification and no money. Plaintiff was detained by the police department until approximately 1:00 a.m., at which time she was issued an appearance ticket for loitering and released. Plaintiff's stated address was approximately five miles from the police station.

Plaintiff contends that although she does not remember the circumstances surrounding her release, she does remember being in a police station and asking for a ride home. "She thinks that one officer agreed to take her, but remembers another saying, 'No, we changed our mind. You can walk, whore.'" Plaintiff's response at 3. However, defendant Judy has testified that he offered plaintiff a ride home and she refused. Defendants' brief at 4.

Over two hours later, at approximately 3:38 a.m., defendant Smyth was dispatched to "EB I–94 ... on report of a woman walking in the center lane of EB I–94." Defendants' Exhibit C at 1. When police arrived, Harry Guyor, a night security guard on duty at nearby Harbor Light Apartments, was at the scene and had illuminated with a spotlight the portion of the median where plaintiff was standing.

Defendant Smyth's police report indicates that when he arrived, he observed plaintiff in the median, walking slowly in a circle. He proceeded to activate his emergency flashers and shine his spotlight on her. As defendant Smyth exited his vehicle, plaintiff ran away from him and onto westbound I–94, where she was struck by a semi-trailer truck. As a result of this accident, plaintiff sustained injuries, including amputation of her right leg at the thigh. Plaintiff was 21 years old at the time of the accident.

Plaintiff asserts that defendants placed her in danger by releasing her from custody that evening. Plaintiff alleges that these actions violated her constitutional rights by disregarding her safety by way of deliberate indifference towards her and placing her in a position of danger. In addition, plaintiff originally claimed that defendants' refusal to release defendant Judy's police report to the family or their attorney amounted to a violation of plaintiff's constitutional rights. However, at oral argument plaintiff conceded that the failure to furnish records does not rise to the level of a constitutional violation.

## STANDARD OF REVIEW

■ Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted) (quoting Black's Law Dictionary 881 (6th ed. 1979)). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

■ The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmov-

ing party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg,* 801 F.2d at 861.

■ To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted). *See Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact. *Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd,* 929 F.2d 701 (6th Cir.1991). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block,* 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

## ANALYSIS

To sustain an action under 42 U.S.C. § 1983, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). Plaintiff contends that "the liberty interests in this case are the right to be free from the infliction of unnecessary pain, as that interest is protected by the fourteenth amendment, and the fundamental right to physical safety and security, protected substantively by the due process clause of the fourteenth amendment." Plaintiff's response at 6.

■ Plaintiff relies primarily on the ruling of the United States Supreme Court in *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* an action was brought on behalf of a four-year old child for permanent brain damage inflicted in beatings by the child's natural father. The mother claimed that the state placed the child in danger by placing him in his father's custody. The district court and court of appeals dismissed the action, holding that the due process clause of the fourteenth amendment did not require a state or local governmental entity to protect its citizens from private violences not attributable to its employees. The rulings were affirmed by the Supreme Court, which stated

> But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the States' power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.
>
> \* \* \* \* \* \*
>
> Its purpose was to protect the people from the State, not to ensure that the State protected them from each other.

*Id.* at 195–96, 109 S.Ct. at 1003.

In *DeShaney,* the boy's mother argued that "even if the Due Process Clause im-

poses no affirmative obligation on the State to provide the general public with adequate protective services, such a duty may arise out of certain 'special relationships' created or assumed by the State with respect to particular individuals." *Id.* at 197, 109 S.Ct. at 1004. The Court agreed that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198, 109 S.Ct. at 1005.

The Court went on to cite with approval *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), in which it held that the eighth amendment prohibition against cruel and unusual punishment required the state to provide adequate medical care to incarcerated prisoners. *DeShaney*, 489 U.S. at 198, 109 S.Ct. at 1005. In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court held that "the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others." *DeShaney*, 489 U.S. at 199, 109 S.Ct. at 1005.

However, the Court stated

But these cases afford petitioner [DeShaney] no help. Taken together, they stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits of state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*DeShaney*, 489 U.S. at 199–200, 109 S.Ct. at 1005–06 (citations and footnote omitted).

Finally, the Court found that

[t]he Estelle–Youngberg analysis simply has no applicability in the present case. Petitioners concede that the harms [minor plaintiff] Joshua suffered did not occur while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. [Footnote omitted.] While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

*Id.* at 201, 109 S.Ct. at 1006.

In the present case plaintiff alleges that a custodial relationship existed and that defendants placed her in a position more dangerous than that in which she was found. Regarding the first allegation, plaintiff has failed to show the requisite custodial relationship. Plaintiff had been in custody earlier that evening, but she was not in custody at the time she suffered physical injuries. In *DeShaney*, the Su-

preme Court defined certain limited, "special relationships," such as those found in *Estelle* and *Youngberg*, as being those in which the claimant is incarcerated or institutionalized. In the present case no such "special relationship" existed.

For her second allegation, that defendants placed her in a position more dangerous than that in which she was found, plaintiff relies on the aforementioned language from *DeShaney* and *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989).

In *Wood*, a police officer left an adult, female passenger alone in a car in the early morning hours after arresting the driver and taking the car keys. The woman was later raped after accepting a ride home from a stranger. The woman brought a 42 U.S.C. § 1983 action against the police officer. The trial court granted defendants' motion for summary judgment. The Ninth Circuit reversed the decision and remanded the action. The appellate court found that Wood had raised a genuine issue of material fact regarding whether the officer acted with deliberate indifference to Wood's interest in personal security. *Id.* at 588. The court noted

> A jury presented with these facts might find [defendant's] conduct to have been 'deliberately indifferent,' 'reckless,' 'grossly negligent,' or merely 'negligent.' *See Fargo v. City of San Juan Bautista*, 857 F.2d 638, 641 (9th Cir.1988) ("When reasonable persons may disagree as to whether particular conduct constitutes negligence, gross negligence or recklessness, the question is one of fact to be decided by a jury." (footnote omitted)).

*Id.* at 588 n. 4.

The Ninth Circuit went on to find that if the defendant officer had acted as plaintiff claimed he had, the officer was not entitled to qualified immunity, as the law had been clearly established in the Ninth Circuit five years earlier. *Id.* at 595.

Plaintiff in the instant case also relies on *Walton v. City of Southfield*, 748 F.Supp. 1214 (E.D.Mich.1990). In *Walton*, plaintiff filed an action against police officers and the City of Southfield, Michigan, after she,

the driver of the car, was taken into custody and her child and grandchild were left at the car by the officers. Defendants filed a motion to dismiss and/or for summary judgment. This court, finding that plaintiff had met her burden of stating a claim under Fed.R.Civ.P. 12(b)(6), denied defendants' motion to dismiss. *Walton*, 748 F.Supp. at 1219.

In the instant action, defendants have filed a motion for summary judgment rather than a motion to dismiss. Thus, this court must find whether a genuine issue of material fact exists. In following the reasoning of the Ninth Circuit in *Wood*, the court would find that a genuine issue of material fact exists regarding whether defendants were deliberately indifferent to plaintiff's interest in personal security and whether defendants placed plaintiff in a position more dangerous than that in which she was found. However, unlike the court in *Wood*, this court finds that, for the reasons that follow, the defendant officers are entitled to qualified immunity.

## QUALIFIED IMMUNITY

Defendants have asserted that even if the court recognizes a constitutional violation under the facts of this case, the officers are entitled to qualified immunity because the constitutional right was not clearly established.

> The Supreme Court has made clear that 'whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness of the action" … assessed in light of the legal rules that were "clearly established" at the time it was taken.' *Anderson v. Creighton*, 483 U.S. 635 [639], 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

\*   \*   \*   \*   \*   \*

In *Anderson v. Creighton, supra*, the Supreme Court elaborated on the level of generality at which legal rights are 'clearly established.' The Court made

clear that for a right to be clearly established it must have been articulated with a significant degree of particularity....
*Eugene D. v. Karman,* 889 F.2d 701, 705–06 (6th Cir.1989). In *Karman,* the Sixth Circuit furnished the following additional quote from *Anderson:*

> It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Karman,* 889 F.2d at 706 (citing *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038–39). The Sixth Circuit continued, "This particularity requirement does not mean that the very action in question must have been held unlawful; it does mean, however, that in light of the pre-existing law, the illegality of the action must be apparent." *Id.* Finally, the Sixth Circuit found that "[t]he issue of qualified immunity is a question of law for the district court." *Id.*

As previously stated, plaintiff relies primarily on the Supreme Court's language in *DeShaney,* an opinion decided February 22, 1989. Plaintiff also relies on *Wood,* the June 27, 1989 opinion from the Court of Appeals for the Ninth Circuit. Plaintiff's alleged constitutional violations were sustained the night of September 10, 1989. The court must examine the state of the law as of the date of the alleged violations.

The Supreme Court's decision in *DeShaney* is replete with language that no affirmative duty is imposed upon the state to ensure the safety of an individual unless the state has taken him into custody and held him against his will. Plaintiff's reliance on *DeShaney* rests on the Court's observation that the state placed the minor plaintiff in no worse position than that in which he would have been had it not acted at all. Thus, the right alleged by plaintiff was not "articulated with a significant degree of particularity." *Karman,* 889 F.2d at 706. Furthermore, "the contours of the right" were not "sufficiently clear that a

reasonable official would understand that what he was doing violates that right." *Id.*

Although the Ninth Circuit provided a lengthy discussion of such an affirmative duty in *Wood,* the Sixth Circuit has recognized "that a single recent case from the court of appeals of another circuit is hardly sufficient to make the law 'clearly established' in this circuit. *Karman,* 889 F.2d at 706. Thus, an understanding of the *Wood* opinion, issued in California approximately ten weeks before plaintiff's apprehension, cannot be imputed to these defendant officers.

Therefore, the doctrine of qualified immunity shields the defendant officers from liability under 42 U.S.C. § 1983; and they are entitled to summary judgment based on their qualified immunity defense.

## MUNICIPAL LIABILITY

Liability against a municipality under 42 U.S.C. § 1983, must be premised upon a finding that the alleged injuries were inflicted pursuant to a governmental custom, policy or practice. A municipality cannot be found liable based on *respondeat superior* or vicarious liability. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *City of Oklahoma v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). In addition, a single incident of unconstitutional activity does not establish an official policy or practice of a municipality sufficient to render the municipality liable for damages under section 1983. *Tuttle,* 471 U.S. at 821, 105 S.Ct. at 2435.

At oral argument it was agreed that discovery would be extended to October 15, 1992, and that plaintiff had until October 29, 1992, to file supplemental materials regarding the issue of municipal liability. Although plaintiff filed an affidavit by Joseph R. Davies, former chief of police for Van Buren Township, plaintiff has failed to present any evidence to support a finding that her alleged injuries were inflicted pursuant to a governmental custom, policy or practice. Furthermore, plaintiff has offered no evidence of other incidents of unconstitutional activity of the sort alleged

here. Therefore, defendant Van Buren Township is entitled to summary judgment.

### ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED that defendants' motion for summary judgment is GRANTED.